FILED
United States Court of Appeals
Tenth Circuit

September 5, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENANT CIRCUIT

IMPACT ENERGY RESOURCES, LLC;
PEAK ROYALTY HOLDINGS, LLC;
QUESTAR EXPLORATION AND
PRODUCTION COMPANY; UINTAH
COUNTY; CARBON COUNTY;
DUCHESNE COUNTY,

    Plaintiffs–Appellants,

v.

KEN SALAZAR, in his official capacity
as Secretary of the Department of the
Interior; UNITED STATES
DEPARTMENT OF THE INTERIOR;
KENT HOFFMAN, in his official
capacity as Deputy State Director for
Minerals, Utah Bureau of Land
Management of the Department of the
Interior; UNITED STATES BUREAU OF
LAND MANAGEMENT, Utah State
Office,

    Defendants–Appellees.

NATIONAL PARKS CONSERVATION
ASSOCIATION; NATIONAL TRUST
FOR HISTORIC PRESERVATION;
SOUTHERN UTAH WILDERNESS
ALLIANCE; NATURAL RESOURCES
DEFENSE COUNCIL; WILDERNESS
SOCIETY; SIERRA CLUB; UTAH
RIVERS COUNCIL; GREAT OLD
BROADS FOR WILDERNESS; GRAND

Nos. 11-4043 & 11-4057

CANYON TRUST,

        Defendants–Intervenors–
        Appellees.

RED ROCK FORESTS,

        Defendant–Intervenor,

------------------------------

WESTERN ENERGY ALLIANCE,

        Amicus Curiae.

**Appeal from the United States District Court
for the District of Utah
(D.C. No. : 2:09-CV-00435-DB)**

Michael L. Beatty, Beatty & Wozniak, P.C. Denver, Colorado, and Mark Ward, Utah Association of Counties, Murray, Utah, (Robert S. Thompson, III, Beatty & Wozniak, P.C., Denver, Colorado, on the briefs) for the Plaintiffs-Appellants.

Robin Cooley, Earthjustice, Denver, Colorado (Steven Bloch and David Garbett, Southern Utah Wilderness Alliance on the briefs), for the Defendants-Intervenors-Appellees.

Vivian H.W. Wang, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., (Ignacio S. Moreno, Assistant Attorney General, David C. Shilton, Tyler Welti, and Charles R. Scott, United States Department of Justice, on the brief) for Defendants-Appellees.

Kent Holsinger and Laura L. Chartrand, Holsinger Law, LLC, Denver, Colorado, filed a brief for Amicus Curiae Western Energy Alliance on behalf of Plaintiffs-Appellants.

Before **LUCERO**, **SEYMOUR**, and **TYMKOVICH**, Circuit Judges.

**PER CURIAM**.

_____

Appellants in this case are companies that submitted high bids on certain oil and gas leases at a Bureau of Land Management ("BLM") auction (collectively, the "Energy Companies"). After the auction but before the leases were issued, newly appointed Secretary of the Interior Ken Salazar decided not to lease the parcels at issue. Salazar announced his decision at a February 4, 2009, press conference and memorialized his determination in a February 6 memorandum to the BLM's Utah State Director. On February 12, 2009, a subordinate BLM official mailed letters to the high bidders indicating that the leases would not be issued. Exactly ninety days later, the Energy Companies filed suit challenging the Secretary's authority to withdraw the leases. The district court dismissed their suit as time-barred under the Mineral Leasing Act ("MLA"), which provides that "[n]o action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter." 30 U.S.C. § 226-2.

A majority of the panel agrees with the district court that the Secretary's final decision in this matter occurred no later than February 6, and thus, the suit is time-barred. As explained in their separate concurrences, however, the panel majority would employ somewhat differing analyses in reaching this result. Judge Lucero would hold that under the plain text of the MLA, the Secretary's decision was final on February 6 regardless of whether plaintiffs' claims under the Administrative Procedure Act ("APA") had accrued

at that time. Judge Seymour would hold that the word "final" bears the same meaning in the phrase "final decision of the Secretary," 30 U.S.C. § 226-2, as it does in the phrase "final agency action" under the APA, 5 U.S.C. § 704, and that final agency action occurred no later than February 6. Judge Tymkovich agrees with Judge Seymour's conclusion that final agency action is necessary, but disagrees with the majority's conclusion that the suit is time-barred as explained in his dissent.

The panel majority also agrees with the district court that the Energy Companies are not entitled to equitable tolling in this matter. The BLM notified the high bidders just six days after the Secretary made his decision. And the government notified the Energy Companies of its position that February 6 was the operative date during agency proceedings. Although the Energy Companies had time to prepare their claims before the limitations period expired, they gambled that a court would accept their proffered limitations theory. Equitable tolling is not required under these circumstances. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

On November 4, 2008, the BLM announced that it would hold a competitive auction of oil and gas leases on certain federal lands in Utah. The auction was scheduled for December 19, 2008. The National Park Service objected to the decision to lease many of the parcels, and after consulting with that agency, the BLM revised its auction to include 132 rather than 241 parcels as originally planned.

Several environmental organizations, including intervenor Southern Utah

Wilderness Alliance ("SUWA"), filed administrative protests of the proposed lease sales. The notice of auction informed potential bidders that the BLM could not actually issue any leases until such protests were resolved. It stated that protested leases would nonetheless be auctioned and that the high bidder would be refunded any monies paid in the event that a parcel was withdrawn as a result of an administrative protest. Shortly before the scheduled auction, SUWA and other conservation groups filed suit in the D.C. District Court seeking to halt the planned sale. See S. Utah Wilderness Alliance v. Allred, 2009 U.S. Dist. LEXIS 30664, at *4 (D.D.C. Jan. 17, 2009) (unpublished).

On December 19, 2008, the auction went forward as planned and the BLM accepted bids on 116 lease parcels. The Energy Companies were recognized as high bidders for several of these parcels—thirty-six of which are located in counties that were also parties to this action below. Subsequently, the BLM recognized the appropriate high bidders and accepted payment for the parcels, with the express caveat that the leases could not actually be issued until all protests were resolved.

On January 17, 2009, the D.C. District Court granted a temporary restraining order prohibiting the BLM from issuing leases on 77 parcels, including those for which the appellants were the highest bidders. See S. Utah Wilderness Alliance, 2009 U.S. Dist. LEXIS 30664, at *9. It found that the environmental groups were likely to succeed on their claims under the National Environmental Policy Act ("NEPA") because the government did not conduct a proper air quality analysis. Id. at *7. The court further concluded that the environmental groups were likely to prevail on their National Historic

Preservation Act and Federal Land Policy and Management Act ("FLPMA") claims because the BLM failed to consider impacts on historic resources. Id. The court made the restraining order effective "until further order of the court" and ordered the parties to submit briefing on a preliminary injunction. Id. at *9.

Newly-appointed Secretary of the Interior Ken Salazar essentially mooted the D.C. District Court dispute shortly thereafter. On February 4, 2009, he held a press conference to announce that the 77 parcels subject to the temporary restraining order would not be leased. He stated: "I have directed [the BLM] not to accept bids on the 77 parcels" and that the "effect will be immediate . . . . This is a directive to the BLM therefore the lease process will not go forward." He further explained, "[W]hat essentially I have done is to have removed the 77 parcels from the consummation of a lease." On the same day, the Department of the Interior issued a press release announcing Salazar's decision on its website, stating:

> In its last weeks in office, the Bush Administration rushed ahead to sell oil and gas leases at the doorstep of some of our nation's most treasured landscapes in Utah. We need to responsibly develop our oil and gas supplies to help us reduce our dependence on foreign oil, but we must do so in a thoughtful and balanced way that allows us to protect our signature landscapes and cultural resources . . . . We will take a fresh look at these 77 parcels and at the adequacy of the environmental review and analysis that led to their being offered for oil and gas development. I am also concerned that there was inadequate consultation with other agencies, including the National Park Service.

The announcement was covered extensively in both the regional and national press. See, e.g., Amy Joi O'Donoghue, Salazar Halts Sale of Utah Oil, Gas Leases, Deseret News, Feb. 5, 2009; Mark Jaffe, Utah Energy Leases Halted, Denver Post, Feb. 5, 2009; Leslie

Kaufman, <u>Interior Secretary Cancels Drilling Leases on Public Lands in Utah</u>, N.Y. Times, Feb. 5, 2009.

The following day, February 5, the federal defendants in the D.C. District Court case filed an unopposed motion to stay briefing on the preliminary injunction question. They stated: "On February 4, 2009, Ken Salazar . . . directed the BLM not to accept the bids on the 77 parcels that are the subject of this Court's temporary restraining order. Accordingly, those leases will not be issued." When this motion was filed, Carbon County—a plaintiff in the action at bar—was a party in that case. Several attorneys that now represent the Energy Companies had entered an appearance and also received this filing.

Also on February 5, the BLM's Utah State Director issued an "Information Memorandum for the Secretary." The memo stated, "On February 4, 2009, Secretary of the Interior Ken Salazar announced the decision to withdraw oil and gas leases offered on 77 parcels . . . . A written decision withdrawing the leases will be needed to document the process." The State Director indicated that once her office received the "officially documented decision from the Secretary," it would begin the process of refunding the payments received from winning bidders.

Secretary Salazar signed and issued a memo to the BLM's Utah State Director the following day, February 6, stating:

> There has been considerable controversy surrounding this lease sale, including questions about the degree of coordination between the BLM and other Federal agencies, including the National Park Service, and the adequacy of the environmental review and analysis performed in

connection with certain parcels as well as the underlying Resource Management Plans. . . . Given the concerns about the adequacy of the consideration[,] . . . I am directing you to withdraw the 77 parcels that were covered by the January 17, 2009, Temporary Restraining Order from further consideration in this lease sale.

In accordance with applicable laws, regulations, and agency procedures, please take all necessary actions to effectuate this withdrawal, including promptly notifying the high bidders and returning any monies received by BLM in connection with these 77 parcels.

This transmittal was not made immediately public.

On February 12, 2009, the BLM's Utah Deputy State Director sent letters via certified mail to the high bidders on the 77 leases explaining that the parcels had been withdrawn. The letters state that "Ken Salazar has directed the BLM to withdraw these parcels from the December 19, 2008 Oil and Gas Lease Sale." They also authorized a refund of the bidders' payments.

The Energy Companies attempted to appeal the lease withdrawals by filing an administrative appeal with the Interior Board of Land Appeals ("IBLA") on March 13, 2009. See Robert L. Bayless Producer, 177 IBLA 83 (2009). The BLM filed a motion to dismiss that appeal on March 23, 2009, on the ground that the IBLA lacks jurisdiction over any decision "approved by the Secretary." 43 C.F.R. § 4.410(a)(3) (withdrawing IBLA authority if "a decision has been approved by the Secretary"). In its motion, the BLM took the position that the appeal sought review of the "February 6, 2009 Decision of the Secretary." It states that "appellants attempt to appeal BLM's February 12, 2009 letters. However, the BLM letters merely implement the Secretary's February 6, 2009 decision to withdraw the subject parcels from further consideration in the December 19,

-8-

2008 oil and gas lease sale." The February 6 transmittal was attached to the motion.

The IBLA granted the motion and dismissed the appeal on April 9, 2009. Robert L. Bayless Producer, 177 IBLA at 85. Its order of dismissal states: "On February 12, 2009, BLM issued decisions related to 53 of those parcels from which this appeal is taken." Id. at 84. However, the order acknowledged the BLM's position that the agency letters "merely implement the Secretary's directive." Id. The IBLA order characterizes the appellants as expressing some confusion as to the relevant date, noting that "they received no decisions other than those that BLM issued on February 12, so it was not clear to them whether BLM's decision or the Secretary's February 6 memorandum was final agency action under the Administrative Procedure Act." Id. Because the Secretary "specifically directed BLM to take a particular action," the IBLA concluded it lacked jurisdiction over the appeal. Id. The IBLA rejected appellants' request for an "opinion as to whether the Secretary's memorandum constitutes 'final' administrative action for purposes of judicial review" because it "do[es] not issue advisory opinions regarding matters in an appeal that we have no authority to consider." Id. at 85.

On May 13, 2009, appellants filed suit against Salazar, the Department of the Interior, the BLM, and the BLM's Deputy Director for Minerals in the District of Utah, challenging the decision to withdraw the leases as violations of the MLA, APA, and FLPMA. Several environmental groups intervened on behalf of the government.

The district court dismissed the action as time-barred. It concluded that the "final decision of the Secretary" as that phrase is used in 30 U.S.C. § 226-2 was Salazar's

February 6 transmittal. And because plaintiffs did not file suit within ninety days of that decision, they did not fit within the MLA's limited waiver of sovereign immunity. The court further concluded that plaintiffs were not entitled to equitable tolling and accordingly entered judgment in favor of the defendants. The Energy Companies now appeal.

**II**

We review a district court's dismissal based on sovereign immunity de novo. See Governor of Kan. v. Kempthorne, 516 F.3d 833, 841 (10th Cir. 2008). "Sovereign immunity protects the United States and its agencies from being sued without their consent." Poche v. Joubran, 644 F.3d 1105, 1108 (10th Cir. 2011). "[T]he party asserting jurisdiction bears the burden of proving that sovereign immunity has been waived." Sydnes v. United States, 523 F.3d 1179, 1183 (10th Cir. 2008) (citation omitted).

Plaintiffs in this case invoke the limited waiver of sovereign immunity provided for in the APA. Under that provision, aggrieved parties may challenge "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. However, the APA prohibits review of agency decisions "to the extent that . . . statutes preclude judicial review." 5 U.S.C. § 701(a). The MLA includes such a prohibition: "No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter."

-10-

30 U.S.C. § 226-2. This statutory deadline constitutes "a condition to the waiver of sovereign immunity and thus must be strictly construed." Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 94 (1990).[1]

The Energy Companies ask that we look to several provisions of the APA in determining when the limitations period began to run. First, they argue that the APA's notice provision supersedes the MLA's statute of limitations such that the limitations period began to run when they received actual notice of the Secretary's decision. They point to the APA's requirement that "[p]rompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding." 5 U.S.C. § 555(e). They further note that the "APA governs agency procedures in all administrative proceedings," Friends of the Bow v. Thompson, 124 F.3d 1210, 1214 (10th Cir. 1997), and that a statute cannot supersede the APA "except to the extent that it does so expressly," 5 U.S.C. § 559.

Neither the APA nor the MLA suggest that the latter's statute of limitations is bound by the former's notice provision. Congress can, and often does, elect to begin a limitations period when a party receives notice. See, e.g., 42 U.S.C. § 1395oo(f)(1) (permitting "civil action commenced within 60 days of the date on which notice of any

---

[1] In Geosearch, Inc. v. Hodel, 801 F.2d 1250, 1252 (10th Cir. 1986), we held that the MLA's statute of limitations is jurisdictional. We overruled Geosearch on other grounds in Reppy v. Department of the Interior, 874 F.2d 728, 730 n.5 (10th Cir. 1989), noting that a recent Supreme Court case might undermine Geosearch's jurisdictional holding. For purposes of this case, whether the statute of limitations is jurisdictional is immaterial because the government moved to dismiss based on the statute of limitations.

final decision by the Board . . . is received"). But the MLA's limitations period is not notice-based. The MLA very clearly starts the clock on the date of "the final decision of the Secretary," 30 U.S.C. § 226-2, not when notice of that decision is received.

There is no textual basis to conclude that a violation of the APA's notice requirement warrants an alteration of another statute's unambiguous limitations provision. APA claims are generally covered by the six-year limitations period contained in 28 U.S.C. § 2401(a). See Smith v. Marsh, 787 F.2d 510, 512 (10th Cir. 1986). Consistent with the plain text of that statute of limitations, we have held that APA claims must be brought within six years of the claim's accrual rather than within six years of notice.[2] See id.; see also 28 U.S.C. § 2401 (actions against the United States must be filed "within six years after the right of action first accrues"). In other words, the limitations provision in 28 U.S.C. § 2401, not the APA's notice provision, determines the limitations start date in the usual APA case. The Energy Companies give us no reason to treat the interaction of § 555(e) and the MLA's statute of limitations differently. Notice may be relevant to the issue of equitable tolling, see Part III infra, but it does not alter the

---

[2] Accrual and actual notice dates are often identical, but diverge with some frequency. See, e.g., Sterlin v. Biomune Sys., 154 F.3d 1191, 1197 (10th Cir. 1998) (a limitations period did not begin "when a plaintiff has full knowledge of the existence of a claim" but "when a plaintiff is placed on 'inquiry notice'" (quotations omitted)). In this case, for example, the Energy Companies argue that their claims accrued on February 12, when the BLM mailed its letters. But the Energy Companies presumably received those letters a day or two later.

-12-

date the limitations period begins to run.[3]

The Energy Companies further argue that the MLA's statute of limitations could not have begun to run until the BLM engaged in "final agency action" under the APA. See 5 U.S.C. § 704. They note that their claims arose under 5 U.S.C. § 704, and accordingly could not have been filed until the final agency action requirement was satisfied. They contend there was no final agency action until the BLM sent the February 12 letters notifying them that the leases had been withdrawn.

As noted supra, the panel majority disagrees that the statute of limitations did not begin to run until the February 12 letters were sent. Rather, they agree that the limitations period began to run by February 6. Judge Lucero would hold that the "final decision of the Secretary" occurred on February 6 regardless of whether "final agency action" also occurred on that date. Judge Seymour would construe the two phrases synonymously, and would hold that both the Secretary's decision and the agency action

_____

[3] The Energy Companies argue that the six-day delay between the Secretary's decision and the mailing of the BLM's notice letters violated their right to procedural due process. They raised this issue for the first time in a Rule 59 motion, and the district court declined to consider it, citing the rule that post-judgment motions are not appropriate vehicles to "advance arguments that could have been raised in prior briefing." Servants of the Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000). We agree with the district court that the Energy Companies failed to raise this issue at the appropriate time and have thus waived appellate review. See Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1270-71 (10th Cir. 2000) (appellate review waived "[w]hen an issue has not been properly raised below").

were final by February 6.[4]  Accordingly, we affirm the district court's conclusion that the Energy Companies' suit is time-barred.

## III

In addition to concluding that the Energy Companies' suit was filed out of time, a majority of the panel agrees that equitable tolling is not appropriate under the facts of this case.  The district court also concluded that the Energy Companies were not entitled to equitable tolling.  We review that determination for abuse of discretion.  See Robinson v. Golder, 443 F.3d 718, 720 (10th Cir. 2006).  Equitable tolling is granted sparingly.  We have held that tolling is appropriate "when the defendant's conduct rises to the level of active deception; where a plaintiff has been lulled into inaction by a defendant, and likewise, if a plaintiff is actively misled or has in some extraordinary way been prevented from asserting his or her rights."  United States v. Clymore, 245 F.3d 1195, 1199 (10th Cir. 2001) (quotation and alteration omitted).

In arguing that tolling is appropriate, the Energy Companies rely heavily on Turner v. Watt, 566 F. Supp. 87 (D. Utah 1983).  Their reliance, however, is misplaced.  The plaintiff in Turner sought to appeal the denial of his application for an oil and gas lease under the MLA.  Id. at 88.  He filed an appeal with the IBLA but temporarily left the country while the appeal was pending.  Id.  When the IBLA rejected his appeal, it

---

[4] In his separate opinion, Judge Tymkovich agrees with Judge Seymour that the "final decision of the Secretary" was "final agency action" in this case, but does not agree that the decision became final before February 12.

erroneously sent a notice to plaintiff's previous address even though plaintiff had filed a notice of change of address.  Id.  Plaintiff learned of the decision when he returned to the country after the limitations period had expired.  Id.  The district court held:  "Because of the agency's error, plaintiff did not receive notice of the board's final decision.  He was entitled to rely on the statute's requirement that it be given, and the running of the period for appeal should not begin until notice is sent in accordance with the statute."  Id. at 89.

To the extent the Turner court interpreted the MLA's limitations period as beginning when a party is notified of the Secretary's decision, we reject such an interpretation for the reasons stated in Part II:  The plain text of the MLA does not permit a notice-based construction.  The Turner decision can be read, however, as tolling the limitations period because plaintiff did not receive notice of the IBLA decision until after the limitations period had run.  In the event that an agency fails to notify a claimant of its decision until after a limitations period has expired, equitable tolling would clearly be appropriate.  See Bowen v. New York, 476 U.S. 467, 481 (1986) ("Where the Government's secretive conduct prevents plaintiffs from knowing of a violation of rights, statutes of limitations have been tolled until such time as plaintiffs had a reasonable opportunity to learn the facts concerning the cause of action." (quotation omitted)).

This case also differs from Turner in an important manner.  In Turner, the plaintiff did not learn of the decision until after his limitations period had expired due to agency error.  In this case, the agency promptly notified the Energy Companies of the Secretary's decision but a few days into the limitations period.  We rejected a request for equitable

tolling under similar circumstances in <u>Pfannenstiel v. Merrill Lynch, Pierce, Fenner & Smith</u>, 477 F.3d 1155 (10th Cir. 2007).  There, plaintiff was subject to a three-month limitations period beginning on the date he received an arbitrator's decision.  <u>Id.</u> at 1158. Two months into that term, he received notice that the arbitrator had lost all of the evidence submitted in the proceeding.  <u>Id.</u> at 1157.  Plaintiff filed a claim beyond the limitations period based on the lost evidence and we rejected his request for equitable tolling because the plaintiff

> could have served the defendants before the expiration of the three-month time limit.  He had approximately one month left after he learned that the evidence was no longer available in order to timely file his motion to vacate, but he did not file it within that time period.  The one-month time period provided [plaintiff] ample opportunity to serve the defendants in a timely fashion.  Thus, equitable tolling does not apply.

<u>Id.</u> at 1158.  Similarly, the D.C. Circuit routinely denies equitable tolling unless a delay in notification "makes it impossible reasonably for the party to comply with the filing statute."  <u>Gardner v. FCC</u>, 530 F.2d 1086, 1091 n.24 (D.C. Cir. 1976).

When the Energy Companies received notice that their leases would not be issued, more than 80 days remained in their limitations periods.  As in <u>Pfannenstiel</u>, they had "ample opportunity" to file their claims in a timely manner.  477 F.3d at 1158.  They do not claim that the six-day delay between the Secretary's decision and the BLM's mailings meaningfully limited their ability to comply with the MLA's statute of limitations.

Despite their receipt of notice a few days into the limitations period, the Energy Companies protest that they were unaware of the February 6 memo until it was served in the IBLA appeal with 45 days remaining in the limitations period.  We note that 45 days

-16-

is still longer than the thirty days approved in <u>Pfannenstiel</u>, but can certainly imagine a case in which a plaintiff is made aware of a decision but kept in the dark as to the precise date the decision was made. And we agree that equitable tolling might be appropriate if such a plaintiff missed the filing deadline based on ignorance of the date of decision. This hypothetical plaintiff would qualify for equitable tolling because he would have "been lulled into inaction by a defendant." <u>Clymore</u>, 245 F.3d at 1199.

In the case at bar, however, the government fully apprised the Energy Companies of its position on the limitations period. In the IBLA proceedings, the government explicitly stated that February 6 was the operative date. Consistent with this position, it challenged the Energy Companies' reliance on the February 12 letters, arguing that "the BLM letters merely implement the Secretary's February 6, 2009 decision to withdraw the subject parcels." The Energy Companies confessed confusion as to "whether BLM's decision or the Secretary's February 6 memorandum was final," <u>Robert L. Bayless Producer</u>, 177 IBLA at 84, but the IBLA could not comment on that issue citing the bar on "advisory opinions regarding matters in an appeal that we have no authority to consider," <u>id.</u> at 85.

Thus, it is undisputed that the government communicated to the Energy Companies its position that February 6 was the date of the Secretary's decision, and the companies acknowledged the possibility that the government's position would hold sway. <u>See</u> <u>id.</u> at 84-85. Despite this knowledge, the Energy Companies gambled. They filed suit exactly 90 days after February 12, risking their claims on the court's acceptance of

their limitations theory.  This gamble did not pay off, and equitable tolling does not forgive "a garden variety claim of excusable neglect."  <u>Irwin</u>, 498 U.S. at 96.  We conclude the district court appropriately exercised its discretion by denying equitable tolling.

## IV

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.