Filed 8/4/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| EDWARD J. ROBERTS, | B266393 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC540910) |
| v. | |
| UNITED HEALTHCARE SERVICES, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Kenneth R. Freeman, Judge. Affirmed.

Kabateck Brown Kellner, Brian S. Kabateck, Joshua H. Haffner, Kevin S. Conlogue, Justin F. Spearman and Drew R. Ferrandini, for Plaintiff and Appellant.

Hogan Lovells US, Michael M. Maddigan, Poopak Nourafchan and Vassiliki Iliadis, for Defendant and Respondent.

Plaintiff Edward J. Roberts (plaintiff) enrolled in a private health plan offering benefits to persons 65 and over as well as disabled persons under the federally funded Medicare Advantage program (42 U.S.C. § 1395w-21 et seq.), and went to an urgent care center outside of the plan's network for medical services; as a result, he was forced to pay a $50 copayment instead of the $30 copayment for in-network centers. Alleging that the plan's marketing materials misled him (and other enrollees) as to the availability of in-network urgent care centers (and their smaller copayments) and that the absence of any in-network urgent care centers in California rendered the plan's network inadequate, plaintiff filed this class action for unfair competition, unjust enrichment and financial elder abuse.

This appeal presents two questions: (1) Are plaintiff's misrepresentation and adequacy-of-network based claims expressly preempted by the preemption clause applicable to Medicare Advantage plans (42 U.S.C. § 1395w-26(b)(3)), or implicitly preempted by the requirement that the plan's marketing materials and adequacy of plan coverage be preapproved by the Center for Medicare and Medicare Services (Center); and (2) are plaintiff's claims, to the extent they challenge a denial of benefits, subject to dismissal because plaintiff did not first exhaust his administrative remedies under the Medicare Act (42 U.S.C. §§ 405(g), (h) & 1395ii)? We conclude that the answer to the first question is yes. In ruling that plaintiff's claims are *expressly* preempted, we part company with *Cotton v. StarCare Medical Group, Inc.* (2010) 183 Cal.App.4th 437, 447-454 (*Cotton*) and *Yarick v. PacifiCare of California* (2009) 179 Cal.App.4th 1158, 1165-1167 (*Yarick*), and join with the later-decided *Do Sung Uhm v. Humana, Inc.* (9th Cir. 2010) 620 F.3d 1134, 1148-1157 (*Uhm*). We further conclude that the answer to the second question is yes. We accordingly affirm the trial court's dismissal of plaintiff's complaint.

### FACTS AND PROCEDURAL BACKGROUND

I.     **Facts**

We draw these facts from the allegations in plaintiff's complaint as well as from documents subject to judicial notice (*Yvanova v. New Century Mortgage Corp.* (2016)

2

62 Cal.4th 919, 924), resolving any conflicts in favor of the judicially noticed documents (*Sciaratta v. U.S. Bank National Assn.* (2016) 247 Cal.App.4th 552, 561).

Defendant United Healthcare Services, Inc. (United Healthcare) offers to persons eligible for Medicare benefits—chiefly, persons 65 and over or who are disabled (42 U.S.C. § 1395c)—several different health care plans under the Medicare Advantage program. As described more fully below, the Medicare Advantage program allows eligible Medicare beneficiaries the right to obtain the statutorily mandated benefits, as well as a variety of additional benefits, through privately run health plans. (See generally *In re Avandia Marketing* (3d Cir. 2012) 685 F.3d 353, 357-358 (*Avandia*).)

United Healthcare advertised its various Medicare Advantage plans with written materials; it submitted those materials, as well as materials regarding the plan's benefits coverage, to the Center for preapproval and the Center had no objection to those materials. In the marketing materials for its AARP Medicare Complete Secure Horizons Plan 1 (Secure Horizons Plan 1), United Healthcare represented that the plan "offer[ed] one of the nation's largest networks, made up of local doctors, clinics and hospitals who know your community." In light of this representation, plaintiff "reasonably believed that there would be an in-network, urgent care healthcare provider within a reasonable distance of his home."

Plaintiff enrolled in the Secure Horizons Plan 1 in April 2013. United Healthcare sent him a "Welcome Book" listing all providers within the plan's network and specifying that the patient copayment for in-network visits was $30 and for out-of-network visits was $50. The closest urgent care center to plaintiff's residence was outside of the plan's network; in fact, the plan had no in-network urgent care centers anywhere in California.

In July 2013, plaintiff needed urgent care and drove to the nearby, out-of-network urgent care center and made a $50 copayment (rather than the $30 copayment).

II.     **Procedural History**

Plaintiff sued United Healthcare on behalf of the class of "all individuals residing in California who, during the four years preceding the filing of this action, enrolled in the

3

[Secure Horizons Plan 1] through [United Healthcare] and paid a co-pay[ment] in excess of $30 for urgent care." Specifically, plaintiff alleged that United Healthcare's marketing materials were misleading and accordingly constituted (1) "unlawful, unfair or fraudulent" business practices in violation of the unfair competition law (Bus. & Prof. Code, §§ 17200 & 17500), Insurance Code section 790.03, subdivision (b) regarding misleading advertising, and Civil Code sections 1571 and 1573 regarding constructive fraud, (2) unjust enrichment, and (3) financial elder abuse (Welf. & Inst. Code, § 15610.30). Plaintiff sought "full disgorgement and restitution," "treble damages" under Civil Code section 3345, punitive damages, injunctive relief, and attorney's fees.

United Healthcare removed the case to federal court. Three months later, the federal court remanded it back to state court.

Following remand, United Healthcare demurred to plaintiff's complaint. In a seven-page written ruling, the trial court determined that plaintiff's lawsuit was "federally preempted by the Medicare Act (and alternatively, that [plaintiff's] administrative remed[ies] ha[d] not been exhausted)" and sustained the demurrer without leave to amend.

The trial court found that plaintiff's lawsuit rested primarily on his claims that United Healthcare's marketing materials misrepresented the scope of in-network services and thus the likely copayments due. Because the Center was required to (and did) preapprove all marketing materials used by the Medicare Advantage plans (42 U.S.C. § 1395w-21(h); 42 C.F.R. §§ 422.2260-422.2276) as well as the adequacy of each plan's network (42 C.F.R. § 422.112), and because the Medicare Act provides that the "standards [applied by the Center] shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [Medicare Advantage] plans which are offered by [Medicare Advantage] organizations under this part" (42 U.S.C. § 1395w-26(b)(3)), the court concluded that plaintiff's allegations "stand directly in contrast to the exclusive power Congress bestowed on the [Center] to regulate" marketing materials and the adequacy of coverage, and thus fell within the terms of the express preemption clause. The court noted that its decision was in accord

4

with the Ninth Circuit's decision in *Uhm*, *supra*, 620 F.3d 1134.  In the court's view, plaintiff's claims were also "arguably" implicitly preempted because his "marketing claims . . . would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

"To the extent plaintiff's claims . . . can be characterized as being based on [United Healthcare's] failure to provide any in-network urgent care centers in California . . . as opposed to . . . misrepresentation of its benefits and services," the court determined that such claims were "inextricably intertwined" with a claim for benefits, and thus had to be administratively exhausted.

The court subsequently entered a judgment of dismissal, which plaintiff has timely appealed.

**DISCUSSION**

**I.      Background Law**

*A.      Medicare Act*

The Medicare Act (Act) is "part of the Social Security Act" and "established a federally subsidized health insurance program . . . administered by the Secretary of Health and Human Services [(Secretary)]."  (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 416 (*McCall*); 42 U.S.C. § 1395 et seq.)  The chief beneficiaries of Medicare insurance are eligible individuals "who are age 65 or over" and individuals suffering from a "disability."  (42 U.S.C. § 1395c.)  The Act provides benefits in four parts.  (*Dial v. Healthspring of Alabama, Inc.* (11th Cir. 2008) 541 F.3d 1044, 1046 (*Dial*).)

Under Parts A and B of the Act, Medicare beneficiaries requiring medical services obtain those services directly from providers participating in the Medicare program, and the Secretary directly reimburses those providers on a "fee-for-service" basis.  (42 U.S.C. §§ 1395c-1395i-5 [Part A] & 1395j-1395w-6 [Part B]; *Avandia*, *supra*, 685 F.3d at p. 357.)  Part A covers "hospital, skilled nursing, home health, and hospice care benefits," while Part B covers "physician and other outpatient services."  (*Dial*, *supra*, 541 F.3d at p. 1046.)

5

In 1997, Congress added Part C to the Act. (42 U.S.C. §§ 1395w-21-1395w-28; see generally Balanced Budget Act of 1997, Pub.L. No. 105-33 (Aug. 5, 1997) 111 Stat. 251, 276.) Under Part C, Medicare beneficiaries can sign up for a privately administered health care plan—originally called a "Medicare+Choice" plan, but later renamed a "Medicare Advantage" plan—that provides all of the Part A and B benefits as well as additional benefits. (42 U.S.C. §§ 1395w-21(a)(1), (d)(4)(A)(i) & 1395w-22(a)(1)-(3), (c)(1)(F); see also *Dial*, *supra*, 541 F.3d at p. 1046; 70 Fed.Reg. 4588 (Jan. 28, 2005) [renaming plan].) If a beneficiary elects to participate in such a plan, the government pays the plan's administrator a flat, monthly fee to provide all Medicare benefits for that beneficiary. Because Part C limits the government's responsibility to just the monthly fee, the private health plan—rather than the government—ends up "assum[ing] the risk associated with insuring" the beneficiary. (*Avandia*, *supra*, 685 F.3d at pp. 357-358; *Yarick*, *supra*, 179 Cal.App.4th at pp. 1163-1164.)

The Secretary closely regulates Medicare Advantage health plans. Although the plan administrator may choose which physicians and facilities to include in the plan's network (42 U.S.C. § 1395w-22(d)(1)), the Secretary—through the Center—reviews each plan to ensure that it has a "sufficient number and range of health care professionals and providers willing to provide services under the terms of the plan." (42 U.S.C. § 1395w-22 (d)(4); 42 C.F.R. §§ 422.100 & 422.112.) Among other things, each plan must "[p]rovide coverage for . . . emergency and urgently needed services." (42 C.F.R. §§ 422.100(b)(1)(ii) & 422.112(a)(9).) To ensure that Medicare beneficiaries can make an informed choice about whether to elect into a Medicare Advantage plan, the Secretary—again, through the Center—reviews all "marketing material" used by Medicare Advantage plans prior to their use; if the Center does not disapprove the materials within 45 days (or fewer days, if the plan uses "model marketing language"), they are deemed approved. (42 U.S.C. § 1395w-21(h)(1)-(h)(5); 42 C.F.R. § 422.2262.) The Secretary is authorized to promulgate regulations setting forth the "standards" for its review of marketing materials, as well as the adequacy of a plan's coverage (42 U.S.C. §§ 1395w-21(h)(2) & 1395w-26(b)(1).) The standards for marketing materials mirror the

6

statutory mandate and require the Center to ensure that the "materials are not materially inaccurate or misleading or otherwise make material misrepresentations." (42 C.F.R. § 422.2264(d); 42 U.S.C. § 1395w-21(h)(2) [same].)

As enacted in 1997, Part C included a two-part express preemption clause. The first part provided that "[t]he standards established" by regulation "shall supersede any State law or regulation . . . with respect to [Medicare Advantage] plans which are offered by [Medicare Advantage] organizations under this part *to the extent such law or regulation is inconsistent with such standards.*" (42 U.S.C. § 1395w-26(b)(3)(A) (2000), italics added.) The second part provided that four categories of "[s]tate standards . . . are superseded" irrespective of inconsistency, including "[r]equirements relating to inclusion or treatment of providers" and "[r]equirements relating to marketing materials and summaries and schedules of benefits regarding a [Medicare Advantage] plan." (42 U.S.C. § 1395w-26(b)(3)(B)(ii), (iv) (2000).)

In 2003, Congress enacted the Medicare Prescription Drug, Improvement and Modernization Act of 2003. (Pub.L. No. 108-173 (Dec. 8, 2003) 117 Stat. 2066.) In addition to adding Part D to grant Medicare beneficiaries prescription drug coverage, the 2003 Act also replaced Part C's two-part express preemption clause with the more simplified, current language: "The standards established" by regulation "shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [Medicare Advantage] plans which are offered by [Medicare Advantage] organizations under [Part C]." (42 U.S.C. § 1395w-26(b)(3).)

### B.    *Demurrers*

In reviewing a complaint dismissed on demurrer due to federal preemption, our review is de novo. (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10 (*Salmon Cases*); *McCall*, *supra*, 25 Cal.4th at p. 415.)

## II.    Preemption

The supremacy clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Const., art. VI, cl. 2.) The clause "vests

7

Congress with the power to preempt state law." (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777 (*Harris*).) This authority may be exercised through federal statutes or federal regulations. (*Jevne v. Superior Court* (2005) 35 Cal.4th 935, 950 ["'federal regulations have no less pre-emptive effect than federal statutes'"], quoting *Fidelity Federal Sav. & Loan Assn. v. de la Cuesta* (1982) 458 U.S. 141, 153.)

Preemption of state law can be express or implied. It is express when Congress positively enacts a preemption clause displacing state law; it is implied when courts infer a congressional intent to displace state law under one of three doctrines of "implied preemption"—namely, "field, conflict, or obstacle preemption." (*Quesada v. Herb Thyme Farms, Inc.* (2015) 62 Cal.4th 298, 308 (*Quesada*).) "Field preemption applies when federal regulation is comprehensive and leaves no room for state regulation"; "[c]onflict preemption is found when it is impossible to comply with both state and federal law simultaneously"; and "[o]bstacle preemption occurs when state law stands as an obstacle to the full accomplishment and execution of congressional objectives." (*Harris*, *supra*, 59 Cal.4th at p. 778.) For all types of preemption, the "foremost" consideration is "congressional intent." (*Jankey v. Lee* (2012) 55 Cal.4th 1038, 1048 (*Jankey*).)

Recognizing that Congress generally treads lightly when displacing state law, we employ a "presumption against preemption" when assessing Congress's intent. (*Quesada*, *supra*, 62 Cal.4th at p. 312; *Jankey*, *supra*, 55 Cal.4th at p. 1048.) Although the "continuing vitality" of this presumption has recently been called into question (*Quesada*, at p. 314), it is still the law and requires us to find a "clear and manifest" congressional intent to displace state law before we may declare that law preempted. (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485; *Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230.) Where, as here, preemption turns on questions of law such as the meaning of a preemption clause or the ascertainment of congressional intent, our review is de novo. (*John v. Superior Court* (2016) 63 Cal.4th 91, 95-96 [statutory construction, including determining legislative intent, reviewed de novo]; *Salmon Cases*,

8

*supra*, 42 Cal.4th at p. 1089, fn. 10 ["federal preemption presents a pure question of law"].)

### A.    *Express preemption*

The express preemption provision at issue here provides:  "The standards established under [Part C] shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [Medicare Advantage] plans which are offered by [Medicare Advantage] organizations under [Part C]."  (42 U.S.C. § 1395w-26(b)(3).)

With express preemption clauses, Congress's intent to preempt is clear; our job is reduced to """"identify[ing] the domain expressly pre-empted.""""  (*Quesada*, *supra*, 62 Cal.4th at p. 308, quoting *Brown v. Mortensen* (2011) 51 Cal.4th 1052, 1062.)  The "best evidence concerning th[at] breadth" is "the statutory text" itself.  (*Quesada*, at p. 308.)  Here, the plain language of section 1395w-26(b)(3) plainly spells out Congress's intent that the standards governing Medicare Advantage plans will displace "*any* State law or regulation" except for State laws regarding licensing or plan solvency.  (Italics added.)  Because the Secretary has promulgated standards governing the content of a Medicare Advantage plan's marketing materials (42 C.F.R. §§ 422.2260-422.2276) as well as the adequacy of its network (42 C.F.R. §§ 422.100 & 422.112), those standards fall within the ambit of the preemption clause.  Because plaintiff's claims for violation of the unfair competition law, for unjust enrichment and for financial elder abuse do not deal with either of the preemption clause's exceptions for licensing or plan solvency, they are preempted "with respect to [United Healthcare's] plan."

The legislative history of the preemption clause, the construction given to it by the Secretary, and the weight of authority interpreting it all confirm this reading.

When Congress amended the preemption clause in 2003, inserting the current clause in lieu of the prior clause superseding "state standards" in four discrete areas and any other "State laws or regulations" "inconsistent" with Part C's standards, the Conference Report on that amendment explained:  "The conference agreement clarifies that the [Medicare Advantage] program is a federal program operated under Federal

9

rules. State laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency." (H.R.Rep. No. 108-391, 1st Sess., p. 557 (2003).) This explanation leaves little room for doubt: The clause means what it says, and the Medicare Advantage standards supersede "*any* State law or regulation" "with respect to" the plans governed by those standards, except in the two carve-outs for licensing and plan solvency.

Although the Secretary (through the Center) initially indicated in her 2003 proposed rulemaking comments that she "continue[d] to believe that generally applicable State tort, contract, or consumer protection law" as well as standards "based on case law precedents" would not be preempted under the 2003 preemption clause (69 Fed.Reg. 46866, 46913-46914 (Aug. 3, 2004)), the Secretary altered that view in the final rulemaking, declaring instead that "all State standards, including those established through case law, are preempted to the extent they specifically would regulate [Medicare Advantage] plans, with exceptions of State licensing and solvency laws" (70 Fed.Reg. 4665 (Jan. 28, 2005)).

The majority of courts to have considered the current preemption clause have interpreted it to displace state laws to the extent they touch upon areas regulated by the Medicare Advantage standards. In *Uhm*, the Ninth Circuit held that the preemption clause preempted state fraud and consumer protection claims based on misleading marketing materials because those materials were subject to preapproval by the Center. (*Uhm*, *supra*, 620 F.3d at pp. 1148-1157.) Although *Uhm* addressed the prescription drug benefits under Part D, Part D expressly incorporates Part C's preemption clause. (42 U.S.C. § 1395w-112(g); *Uhm*, at p. 1148.) *Phillips v. Kaiser Foundation Health Plan, Inc.* (N.D.Cal. 2011) 953 F.Supp.2d 1078, 1087-1090, applied *Uhm* to Part C's express preemption clause and concluded that the plaintiff's misleading marketing claims under our state's Unfair Competition Law and Consumer Legal Remedies Act (Civ. Code, § 1770 et seq.) were expressly preempted. (Accord, *Meek-Horton v. Trover Solutions, Inc.* (S.D.N.Y. 2012) 910 F.Supp.2d 690, 696 [following *Uhm*]; *PacifiCare of Nevada, Inc. v. Rogers* (Nev. 2011) 266 P.3d 596, 600-601 [following *Uhm*]; *Rudek*

10

*v. Presence Our Lady of the Resurrection Med. Ctr.* (E.D.Ill. Oct. 27, 2014, No. 13 C 06022) 2014 U.S.Dist. Lexis 152025 [following *Uhm*].)

Two California Court of Appeal decisions have construed Part C's express preemption clause more narrowly. In *Yarick*, *supra*, 179 Cal.App.4th at pp. 1165-1167, the Fifth District held that the phrase "any State law or regulation" in Part C's express preemption clause only reached (1) "positive state enactments" such as "laws and administrative regulations, but not the common law," and (2) common-law rights grounded solely in duties created by positive state law. In reaching this conclusion, the court cited *Sprietsma v. Mercury Marine* (2002) 537 U.S. 51 (*Sprietsma*), which had given the same construction to similar language in the preemption clause in the Federal Boat Safety Act of 1971 (46 U.S.C. § 4306). (*Yarick*, at pp. 1165-1166.) In *Cotton*, *supra*, 183 Cal.App.4th at pp. 449-451, the Fourth District followed *Yarick*'s holding that Part C's preemption clause was limited to positive state enactments and went one step further: It read the clause's mandate that Part C standards "shall supersede any State law or regulation . . . *with respect to* [Medicare Advantage] plans" to mean that the "State law or regulation" had to be "with respect to" the plans, and could not be general in application. Thus, under *Cotton*, Part C's preemption clause reaches only state statutes or regulations that are targeted at Medicare Advantage plans; common-law rights and all generally applicable statutes and regulations are *not* preempted.

We disagree with both of these limitations and decline to follow *Yarick* and *Cotton*.

We reject *Yarick*'s holding that Part C's preemption clause reaches only positively enacted state laws and regulations for two reasons.

First, it is inconsistent with *Riegel v. Medtronic, Inc.* (2008) 552 U.S. 312 (*Riegel*). There, the United States Supreme Court held that the preemption clause in the Medical Device Amendments of 1976 (21 U.S.C. § 360k), which preempted state "requirements," reached "common-law duties" as well as duties created by positive law. (*Riegel*, at p. 324 ["Absent other indication, reference to a State's 'requirements' includes its common-law duties"].) Although the preemption clause here refers to "State law or

11

regulation" rather than state-law "requirements," *Riegel*'s rationale applies with full force here:  "[E]xcluding common-law duties from the scope of pre-emption would make little sense" because common-law duties prescribing different standards than those imposed by federal law "disrupt[] the federal scheme no less than state regulatory law to the same effect."  (*Id.* at pp. 324-325; accord, *Sanai v. Saltz* (2009) 170 Cal.App.4th 746, 772 ["Federal laws may preempt state common law as well as state legislation"].)

Second, we are not persuaded that *Sprietsma*—the *Yarick* court's chief justification for its limitation—is relevant.  In *Sprietsma*, the Supreme Court construed the preemption clause in the Federal Boat Safety Act of 1971.  (*Sprietsma*, *supra*, 537 U.S. at p. 54.)  The clause provided that "a State . . . may not establish, continue in effect, or enforce *a* law or regulation establishing a recreational vessel or associated equipment performance or other safety standard or imposing a requirement for associated equipment" (46 U.S.C. § 4306, italics added), but that federal law elsewhere had a savings clause providing that "compliance with this chapter or standards, regulations, or orders prescribed under this chapter does not relieve a person from liability at common law or under State law" (46 U.S.C. § 4311(g)).  *Sprietsma* held that the clause reached only positive state enactments and grounded its holding on three points:  (1) "[T]he article 'a' before 'law or regulation' implies a discreteness—which is embodied in statutes and regulations—that is not present in the common law" (*Sprietsma*, at p. 63); (2) the word "law" in "law or regulation" "might . . . be interpreted to include regulations, which would render the express reference to 'regulation' . . . superfluous" (*ibid.*); and (3) the existence of the savings clause, which exists to "'save'" "'some significant number of common-law liability cases'" (*ibid.*, quoting *Geier v. American Honda Motor Co.* (2000) 529 U.S. 861, 868).  The first and third rationales are wholly inapplicable to Part C.  Part C's preemption clause refers to "*any* State law or regulation"—not "*a* State law or regulation"; because "'the word "any" has an expansive meaning, that is, "one or some indiscriminately of whatever kind"'" (*Ali v. Fed. Bureau of Prisons* (2008) 552 U.S. 214, 218-219; *Ennabe v. Manosa* (2014) 58 Cal.4th 697, 714), "[t]he use of 'any' negates the 'discreteness' that the Court identified in *Sprietsma*" (*Uhm*, *supra*,

12

620 F.3d at p. 1153). Part C also has no clause saving common-law actions. The closest the Act comes is section 1395, which reserves to state law only the "supervision or control" (1) "over the practice of medicine or the manner in which medical services are provided," (2) "over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services," or (3) "over the administration or operation of any such institution." (42 U.S.C. § 1395.) Even if we assume that Part C's later-enacted express preemption clause did not supersede this reservation clause (*State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 960 ["'[i]f conflicting statutes cannot be reconciled, later enactments supersede earlier ones'"]), the reservation clause does not purport to preserve common-law actions dealing with the same subjects otherwise covered by Part C's standards—and hence does not override Part C's preemption clause.

*Sprietsma'*s second rationale—the concern that the word "regulation" "might" be superfluous if the word "law" were read broadly to reach *all* positive and common-law enactments—applies to Part C's preemption clause, but is in our view too thin a reed upon which to leave all common-law actions intact when doing so, as noted above, would disrupt the efficacy of the Center's preapproval of marketing materials and plan coverage. The canon of statutory construction that counsels against construing words as surplusage is just a guide for ascertaining legislative intent, it is not a command. (*United States v. Atlantic Research Corp.* (2007) 551 U.S. 128, 137; *Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1017-1018.) Where, as here, that canon leads to a result at odds with the otherwise clearly expressed legislative intent, the canon necessarily yields to that intent.

We also reject *Cotton'*s holding that Part C's preemption clause only reaches laws specifically targeting Medicare Advantage plans. *Riegel* rejected that very same argument when it held that the Medical Device Amendments of 1976's preemption clause, which reaches "requirements . . . with respect to" medical devices, did not mean that the state laws preempted by that clause "must apply *only* to the relevant device, or only to medical devices and not to all products and all actions in general."

13

(*Riegel*, *supra*, 552 U.S. at pp. 327-328.) In other words, the phrase "with respect to" does not refer to the specificity or breadth of the "State law or regulation" to be preempted; instead, it refers to the extent of preemption—those laws or regulations are superseded to the extent Part C's standards supersede them but no further.

Plaintiff offers four further reasons why, in his view, Part C's express preemption clause should not bar his lawsuit. First, he argues that our Supreme Court came to a contrary conclusion in *McCall*, *supra*, 25 Cal.4th 412. *McCall* held that Medicare beneficiaries suing a health maintenance organization (HMO) under state law for negligence, fraud and other torts in refusing to provide medical services were not required to exhaust their claims administratively. (*Id.* at pp. 414-415.) In the course of reaching this holding, *McCall* also noted that the plaintiff's claims were not preempted by the Medicare Act because "[n]o intent to displace state tort law remedies was expressed in the Medicare Act *as it read at the time relevant to this case.*" (*Id.* at p. 422, italics added.) But *McCall* was interpreting Parts A and B of the Act (*id.* at p. 416), which do not have an express preemption clause—not Part C, which does. Indeed, the *McCall* court commented how Congress later enacted Part C's preemption clause, and contrasted it with the "then applicable law" at issue in *McCall*. (*Id.* at pp. 423-424.)

Second, plaintiff argues that *Uhm* is distinguishable because it dealt with Medicare's prescription drug benefits defined in Part D, rather that the Medicare Advantage program defined in Part C. As noted above, however, Part D expressly incorporates Part C's preemption clause; the analysis is identical, so is the result.

Third, plaintiff asserts that the preemption clause by its own terms does not apply to his challenge to the representations in United Healthcare's marketing materials regarding the adequacy of its network because the Center's review of those materials is inadequate (and, under plaintiff's view, ostensibly not subject to preemption) unless the Center could compare those marketing materials against the adequacy of United Healthcare's network. This assertion lacks merit both factually and legally. Factually, plaintiff's assertion ignores that the Center did review—and did approve—the adequacy of United Healthcare's network. Legally, plaintiff's assertion seems to rest on the

14

premise that preemption only applies if a state court satisfies itself that the federal standards to be preempted were properly applied, with the propriety of review ostensibly being judged with standards set forth by state law; but this premise is antithetical to the very concept of preemption, which is to insulate the areas Congress designates as preempted from review under state law.  (*Harris*, *supra*, 59 Cal.4th at p. 778.)

Lastly, plaintiff contends that the federal court's remand to state court rests on a finding that there was no "complete preemption," and that this finding means that United Healthcare's preemption defense lacks merit.  The premise of plaintiff's argument is that "complete preemption" and the preemption question we decide here are one and the same; they are not.  "Complete preemption" is a "doctrine of jurisdiction" that applies when a federal statute has such "'extraordinary' preemptive force" that a federal court is "obligated to construe [a] complaint [pleading state-law causes of action] as raising a federal claim," thereby overcoming the general rule that a *defense* based on federal law cannot support federal jurisdiction when the plaintiff's "well-pleaded complaint" is based on state law.  (*Sullivan v. American Airlines, Inc.* (2d Cir. 2005) 424 F.3d 267, 271-272; *Marin Gen. Hosp. v. Modesto & Empire Traction Co.* (9th Cir. 2009) 581 F.3d 941, 945; *Retail Property Trust v. United Broth. of Carpenters* (9th Cir. 2014) 768 F.3d 938, 948-949.)  So far, the United States Supreme Court has identified only three federal statutes with "complete preemptive" force—the Labor-Management Relations Act (29 U.S.C. § 185), the Employee Retirement Income Security Act (ERISA) (29 U.S.C. § 1132(a)), and the National Bank Act (12 U.S.C. §§ 85-86).  (See *Sullivan*, at p. 272.)  The doctrine of federal preemption we outline and apply above is called "defensive preemption"; it is a substantive defense to a claim based on state law.  (*Retail Property Trust*, at pp. 948-949; *Hall v. North American Van Lines, Inc.* (9th Cir. 2007) 476 F.3d 683, 689, fn. 8).)  The doctrine of *complete* preemption does not apply to Part C (*Parra v. PacifiCare of Arizona, Inc.* (9th Cir. 2013) 715 F.3d 1146, 1155), but this does not mean that preemption cannot be raised as a substantive defense (*id.* at pp. 1155-1156, fn. 3).  Indeed, the federal court's remand order that rejected complete preemption as a

jurisdictional doctrine explicitly left open the substantive question of defensive preemption for resolution on remand.

### B. *Implied preemption*

Under the doctrine of "obstacle preemption," federal law can impliedly preempt state law where "state law stands as an obstacle to the full accomplishment and execution of congressional objectives." (*Harris*, *supra*, 59 Cal.4th at p. 778.) Congress requires the Secretary to evaluate the marketing materials and the adequacy of Medicare Advantage health plans, and the Secretary promulgated regulations and entrusts the Center with reviewing and approving marketing materials and the plans themselves. "Were a state court to determine that [a plan's] marketing materials constituted misrepresentations resulting in fraud or fraud in the inducement, it would directly undermine [the Center's] prior determination that those materials were not misleading and in turn undermine [the Center's] ability to create its own standards for what constitutes 'misleading' information about Medicare Part D." (*Uhm*, *supra*, 620 F.3d at p. 1157.) Indeed, the courts in *Cotton* and *Yarick* came to the same conclusion with respect to the portions of the plans preapproved by the Center. (*Cotton*, *supra*, 183 Cal.App.4th at p. 455; *Yarick*, *supra*, 179 Cal.App.4th at pp. 1165-1167.) *Yarick* itself noted, "[i]f state common law judgments were permitted to impose damages on the basis of these federally approved [actions], the federal authorities would lose control of the regulatory authority that is at the very core of Medicare generally and the [Medicare Advantage] program specifically." (*Yarick*, at pp. 1167-1168.) Accordingly, we further conclude that plaintiff's claims based on misrepresentations in United Healthcare's marketing materials and based on the adequacy of its plan are impliedly preempted by the Act as well.

## III. Exhaustion

"When remedies before an administrative forum are available, a party must in general exhaust them before seeking judicial relief." (*City of San Jose v. Operating Engineers Local Union No. 3* (2010) 49 Cal.4th 597, 609, citing *Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1080.) "Exhaustion requires 'a full presentation to the administrative

agency upon all issues of the case and at all prescribed stages of the administrative proceedings.'" (*City of San Jose*, at p. 609, quoting *Bleeck v. State Board of Optometry* (1971) 18 Cal.App.3d 415, 432.) "Exhaustion of *administrative* remedies is 'a jurisdictional prerequisite to resort to the courts.'" (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 70, quoting *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 293.)

When a defendant claims that the courts lack jurisdiction over a plaintiff's lawsuit because that plaintiff has not exhausted his administrative remedies, we must decide: (1) was the plaintiff required to exhaust the claims he now presses in court?; and (2) if so, did he fully exhaust them? The first question is a question of law we review de novo. (*Defend Our Waterfront v. State Lands Com.* (2015) 240 Cal.App.4th 570, 580.) So is the second question, at least where, as here, we are evaluating only the allegations of a complaint and judicially noticed documents. (E.g., *Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1384 [where "appeal involves the application of a statute to undisputed facts, our review is de novo"].)

When a Medicare beneficiary participating in a Part C-authorized private health care plan challenges his "entitle[ment] to receive a health service" or "the amount (if any) that [he] is required to pay with respect to such service," Congress has erected a four-tier administrative review scheme. First, the beneficiary must raise his challenge with the Medicare Advantage plan itself, and Congress requires every such plan to "have a procedure for making [those] determinations" and requires the plan's administrator to issue a written statement "of the reasons for the denial." (42 U.S.C. § 1395w-22(g)(1).) Second, the beneficiary must seek reconsideration of an adverse determination with the Medicare Advantage plan, which Congress also specifies that each plan must offer. (*Id.*, § 1395w-22(g)(2).) Third, the beneficiary must appeal the denial of reconsideration to the "independent, outside entity" designated by the Secretary "to review and resolve . . . reconsiderations that affirm denial of coverage, in whole or in part." (*Id.*, § 1395w-22(g)(4); see generally *Willy v. Administrative Review Bd.* (5th Cir. 2005) 423 F.3d 483, 491-492 [agency head may delegate its authority to issue final decisions]; *Impact Energy*

17

*Resources, LLC v. Salazar* (10th Cir. 2012) 693 F.3d 1239, 1252, fn. 1 [same].) Fourth, if the independent, outside entity denies relief and "the amount in controversy is $100 or more," the beneficiary must seek a hearing before the Secretary. (42 U.S.C. § 1395w-22(g)(5); accord, 42 U.S.C. § 1395mm(c)(5)(B) [same, for benefits claims under Parts A and B].) If the Secretary denies relief and "the amount in controversy is $1,000 or more," then and only then may the beneficiary obtain judicial review of that decision. (42 U.S.C. §§ 1395w-22(g)(5) & § 1395ii [incorporating general administrative exhaustion provision for Title 42 into Medicare Act]; see also 42 U.S.C. § 405(g), (h) [general administrative exhaustion and judicial review provisions for Title 42].)

In assessing whether a plaintiff's claim is subject to exhaustion, courts look not only to how the plaintiff has styled his claim, but also to its substance. Consistent with the more specific multi-tiered administrative review scheme under Part C set forth above, a plaintiff's claim that he "is entitled to benefits[] and the amount of [those] benefits" is, as a general matter, a claim that "arises under" the Medicare Act and one that must therefore be administratively exhausted. (*McCall*, *supra*, 25 Cal.4th at pp. 416-417; 42 U.S.C. § 405(h).) Even if a plaintiff's claim is not expressly styled as seeking benefits, courts will treat it as such (and hence as a claim "arising under" the Medicare Act) if either (1) ""the standing and the substantive basis for the presentation" of the claim is the Medicare Act," or (2) "the claim is 'inextricably intertwined' with a claim for Medicare benefits" (*McCall*, at p. 417, quoting *Heckler v. Ringer* (1984) 466 U.S. 602, 614-615) because the plaintiff is "at bottom . . . seeking to recover benefits." (*Ardary v. Aetna Health Plans of California, Inc.* (9th Cir. 1996) 98 F.3d 496, 499-500; see also *Heckler*, at p. 614; *McCall*, at pp. 424-425; accord, *Uhm*, *supra*, 620 F.3d at p. 1143 [exhaustion requirement applies to "creatively disguised claims for benefits"].)

In this case, plaintiff's complaint expressly asserts that United Healthcare: (1) used misleading marketing materials; and (2) provided inadequate coverage. These assertions are not claims for benefits or inextricably intertwined with claims for benefits, and thus fall outside of the exhaustion requirement. (See *Uhm*, *supra*, 620 F.3d at p. 1145 [so holding].) That is why we have addressed whether those claims are, on

18

their merits, preempted by the Act. However, the trial court also liberally construed plaintiff's complaint as implicitly raising a third claim—namely, a challenge to "the amount (if any) that [plaintiff] is required to pay with respect to" the urgent care service he received. (42 U.S.C. § 1395w-22(g)(1).) This third, implicit claim is, by definition, a claim for benefits, and therefore subject to the four-tier exhaustion scheme outlined above.

It is undisputed that plaintiff did not exhaust *any* of his administrative remedies. In his complaint, he did not allege compliance with any of the four tiers of review. On appeal, he asserts that United Healthcare lacked "proper procedures to resolve grievances." This is factually incorrect because United Healthcare's plan specifically empowers enrollees to challenge a benefit determination and, if dissatisfied with that challenge, to seek reconsideration through an appeal. Indeed, plaintiff's lack of awareness of United Healthcare's internal procedures for challenging benefits determinations confirms that he did not satisfy the first two steps of administrative exhaustion and thus could not have satisfied the third.

Plaintiff raises two arguments in response. First, he asserts that his claim for benefits was a claim for only $20, that this amount falls below the $100 threshold for obtaining a hearing before the Secretary, and that he accordingly had no administrative remedies to exhaust. This argument ignores that the hearing before the Secretary was the *fourth* tier of administrative review. Because plaintiff did not pursue any of the preceding three tiers—including the tier before the "outside, independent agency" that, in the absence of a hearing, issued the Secretary's final decision—he did not exhaust his administrative remedies.

Second, plaintiff contends that United Healthcare should not be permitted to raise plaintiff's failure to exhaust administrative remedies because it did not provide the required internal procedures for challenging benefit determinations, and thus has "unclean hands." Not only is this factually incorrect for the reasons stated above, it is also legally incorrect. Although unclean hands may be asserted as a defense to legal and equitable causes of action (e.g., *Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407,

19

432), the doctrine may not be asserted to avoid "do[ing] what the law requires and exhaust[ing] [his] administrative remedies" (*Kaiser Foundation Hospitals v. Superior Court* (2005) 128 Cal.App.4th 85, 111).

## DISPOSITION

The judgment of dismissal is affirmed. United Healthcare is entitled to its costs on appeal.

## <u>CERTIFIED FOR PUBLICATION.</u>

_____, J.
HOFFSTADT

We concur:

_____, P.J.
BOREN

_____, J.
CHAVEZ

20