[No. F057032. Fifth Dist. Dec. 1, 2009.]

LISA YARICK, as Administrator, etc., Plaintiff and Appellant, v. PACIFICARE OF CALIFORNIA, Defendant and Respondent.

## Counsel

Balisok & Associates, Russell S. Balisok and Steven C. Wilheim for Plaintiff and Appellant.

Dorsey & Whitney, Steven D. Allison and Christy L. Bertram for Defendant and Respondent.

OPINION

**VARTABEDIAN, Acting P. J.**—This is an appeal from judgment entered after the court sustained without leave to amend a demurrer to the fourth amended complaint filed by plaintiff and appellant Lisa Yarick, administrator of the estate of Joseph Yarick. The court ruled that claims against defendant and respondent PacifiCare of California (hereafter respondent), one of several defendants below, were "preempted in [their] entirety by the federal government." (Capitalization omitted.) We agree and will affirm the judgment.

### Facts and Procedural History

According to the allegations of the fourth amended complaint, which we deem true for the present appeal from judgment after a sustained demurrer (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]), Joseph Yarick received health care benefits under the federal Medicare Advantage program. (See generally 42 U.S.C. § 1395w-21 et seq.) His health care benefits were provided through Secure Horizons, respondent's Medicare managed care plan.

In early January of 2006, Mr. Yarick, who "was over 85 years of age," was admitted to defendant San Joaquin Community Hospital because he had fallen and broken his leg. Mr. Yarick had surgery to repair his broken leg and, three days later, was transferred to Rosewood Health Facility, operated by defendant American Baptist Homes of the West, for rehabilitation and custodial care.

Over the next three weeks, Mr. Yarick's condition deteriorated in various ways. Nevertheless, Rosewood Health Facility and defendant Bakersfield Family Medical Group, despite the objection of Mr. Yarick's family, discharged Mr. Yarick. When the family arrived to receive Mr. Yarick upon discharge, they found him "slumped in a wheel chair and not responsive." The family called an ambulance, which transported Mr. Yarick to Mercy Hospital, operated by defendant Catholic Healthcare West.

Mr. Yarick was diagnosed with multiple conditions, including pneumonia and congestive heart failure. Over the next two weeks, according to the complaint, doctors of defendant Bakersfield Family Medical Group first counseled, and then pressured, appellant to terminate efforts at curing Mr. Yarick and to substitute, instead, "comfort" or end-of-life care. Although appellant continued to insist on curative care, as a result of the efforts of the various defendants, Mr. Yarick died on February 18, 2006.

The fourth amended complaint alleges that all of the foregoing events happened because of the financial pressures and incentives that arose from the care providers' contracts with respondent. The complaint alleges respondent's contracts with providers offer insufficient payment to permit the providers to make decisions and to provide care based on patients' reasonable medical needs, requiring the providers to substitute a standard of financial expediency. It alleges some of the contracts provide financial incentives for the refusal to provide reasonably necessary medical care. It alleges respondent has failed to implement and utilize necessary quality control mechanisms that would require providers to give good medical care despite the financial incentives not to do so. The complaint does not allege respondent made or participated in care determinations concerning Mr. Yarick specifically, nor does it allege appellant sought respondent's assistance to obtain care for Mr. Yarick.

Respondent demurred to the original complaint and to each subsequent complaint. As relevant to this appeal, on respondent's demurrer to the third amended complaint, the court granted the demurrer without leave to amend as to appellant's second cause of action, entitled "Willful Misconduct." The court determined the second cause of action failed to allege facts sufficient to state a cause of action and that appellant conceded there were no further facts she could allege. The court also sustained the demurrer as to the remaining causes of action, but permitted appellant to file a further amended complaint.

Appellant's fourth amended complaint set forth causes of action for negligence, elder abuse, and wrongful death. Respondent demurred to the fourth amended complaint on the basis that the causes of action were pre-empted by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 42 United States Code section 1395w-26(b)(3). Respondent also contended that none of the causes of action stated facts sufficient to constitute a cause of action and that all were uncertain.

After hearing, the court sustained the demurrer on all causes of action without leave to amend on the basis that the claims were preempted by federal law. The court entered judgment dismissing the complaint. Appellant filed a timely notice of appeal.

## Discussion

### I. The Medicare Advantage Program

Appellant's primary claim against respondent, both here and in the trial court, is that the contractual structure through which respondent arranges to provide medical services gives the medical care providers an undue financial incentive to deny medically reasonable services. We will begin with a brief

description of the insurance program pursuant to which respondent enters into contracts with medical providers.

Medicare Advantage (MA) (previously known as Medicare+Choice) is a federal program designed to permit persons eligible for Medicare to enroll in private insurance plans, including health maintenance organizations (HMO's). The Medicare program pays all or most of the premium for that insurance in lieu of paying Medicare benefits directly to service providers. (See 1 Cal. Elder Law Resources, Benefits, and Planning (Cont.Ed.Bar 2009) Introduction to Medicare, §§ 7.65, 7.68, pp. 437–440; see also Medicare Advantage Program, 42 C.F.R. § 422.1 et seq. (2008).)

Respondent provides an MA HMO plan marketed under the name Secure Horizons. Respondent is a health insurance company and does not directly provide medical services. Instead, it contracts with local health care providers, who then provide physician, hospital, and other medical services to Secure Horizons plan members.

As an organization providing an MA plan, respondent, through a process of bidding and negotiation (see 42 C.F.R. § 422.250 et seq. (2008)), contracts with the Centers for Medicare and Medicaid Services (CMS) to receive a monthly payment from Medicare for each person enrolled in respondent's MA plan. In return, respondent must arrange to provide a specified range of services for enrollees. (See 42 C.F.R. § 422.300 et seq. (2008).) Similarly, as relevant in this case, respondent contracts with a physicians group and two hospitals for provision of direct services to enrollees, again based, primarily, on a negotiated monthly fee for each enrollee regardless of services actually provided in a particular month. This payment mechanism is generally called "capitation." (See 42 C.F.R. § 422.208(a) (2008).)

Respondent and its participating medical providers are contractually bound to provide adequate access to covered medical services. (See, e.g., 42 C.F.R. § 422.112(a)(1) (2008).) Service providers are required to provide medically necessary care in a competent manner. (See id., § 422.112(a)(6)(i) (2008).) Nevertheless, it is obvious that an MA organization or a provider receiving capitation payments would, in any given month, make more money if it reduced costs by providing fewer services than the average anticipated by the parties in arriving at a capitation formula.

Apparently Medicare is concerned that contractual, ethical, and long-term patient satisfaction considerations may not be sufficient incentives for organi-

zations and providers to render timely, sufficient, and quality care. As a result, federal regulations require the following: the actual and timely provision of contracted services (see 42 C.F.R. §§ 422.101(a), 422.112(a), 422.504(a) (2008)), noninterference by entities receiving capitated payments in the individual medical decision of the actual service provider (see 42 C.F.R. §§ 422.206, 422.208(c)(1), 422.504(a) (2008)), extensive quality assurance programs and review (see 42 C.F.R. §§ 422.152, 422.202(b), 422.504(a) (2008)), and an administrative grievance procedure that allows the patient to challenge a determination that a service is not covered by the plan or is not medically necessary (42 C.F.R. § 422.560 et seq. (2008)). CMS periodically reviews all contracts and usage data, with a view to ensuring quality and availability of services. (See 42 C.F.R. §§ 422.256(b)(2), 422.503(d) (2008).)

## II. The Complaint

Appellant sued both respondent and all the various medical service providers who had anything to do with the course of treatment that ended in Mr. Yarick's death. The present appeal involves only the judgment dismissing the action against respondent; as far as our record discloses, the action continues against the other defendants.

As to respondent, the fourth amended complaint preliminarily alleges respondent had a duty "to arrange [its] business and financial affairs" so that it did not "subject health care providers . . . to undue business or financial incentives to limit the quality or quantity of care reasonably required by patients, in accord with California Health & Safety Code §§ 1367.01; 1367.03; 28 Cal. Code Regs. § 1300.70(a); (b)(1)(D)." Similarly, the complaint alleges respondent had a duty to exercise due diligence to ensure that its providers were providing adequate care and were solvent enough to withstand the financial pressure to deny or limit care created by respondent's contracts with them. "This duty is prescribed in California Health & Safety Code §§ 1367(a)–(i); 1367.02" and in the California Code of Regulations. Additionally, the complaint alleges respondent had a duty to "formulate and implement an ongoing quality assurance program in compliance with Health & Safety Code § 1367 [sic, presumably § 1370] and [the relevant regulations] to ensure that the financial incentives inherent in the capitated fee contracts . . . do not unduly financially incentivize contracting health care providers . . . to do anything the effect of which is to delay or deny covered health care benefits" to enrollees "such as Decedent," Mr. Yarick.

The first cause of action, for negligence, alleges respondent breached the "aforesaid duty of care" and as a result Mr. Yarick was denied reasonably

necessary care and treatment, resulting in "severe personal and physical injury." The second cause of action ("Elder Abuse") repeats essentially the same allegations, with the additional allegations that respondent knew that its breaches of duty "posed the probability of injury or death to enrollees," knew enrollees would be denied reasonably necessary medical care, and knew there was a "high probability that enrollee patients cared for by [the] contracting health care providers would become diseased, ill, or die." (See Welf. & Inst. Code, § 15657 [permitting additional damages and award of attorney fees in specified circumstances, including neglect, when accompanied by reckless-ness or malice].) The third cause of action, for wrongful death, simply adds the allegation that Mr. Yarick died as a proximate result of respondent's breaches of duty previously alleged.

In addition to her appeal from dismissal of the three causes of action comprising the fourth amended complaint, appellant also contends the court erred in dismissing without leave to amend the second cause of action in her third amended complaint, a cause of action entitled "Willful Misconduct." This cause of action is premised on the same alleged breaches of duty contained in the fourth amended complaint, with the additional allegation that respondent's breaches of duty were "intentional" and "intentionally disre-garded the probability that injury, illness, or death to Decedent and other Medicare-aged enrollee-patients would result from the care provided, the care withheld, and the care delayed."

### III. Preemption

Valid federal legislation prevails over state law pursuant to the supremacy clause of the United States Constitution, article VI, clause 2. Where federal law and state law do not directly conflict, however, courts will determine that federal law preempts state law where preemption is the "clear and manifest purpose of Congress." (*Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [91 L.Ed. 1447, 67 S.Ct. 1146].)

Such congressional purpose may be express or implied. Where federal legislation contains an express preemption provision, we first focus on the plain wording of the provision, "which necessarily contains the best evidence of Congress' pre-emptive intent." (*CSX Transp., Inc. v. Easterwood* (1993) 507 U.S. 658, 664 [123 L.Ed.2d 387, 113 S.Ct. 1732].) In the present case, the federal law establishing the MA program states: "The standards estab-lished under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part." (42 U.S.C. § 1395w-26(b)(3).) Such language usually is interpreted to preempt only "positive state enactments," that is, laws and administrative regulations, but

not the common law. (See *Sprietsma v. Mercury Marine* (2002) 537 U.S. 51, 63 [154 L.Ed.2d 466, 123 S.Ct. 518].) In part IV.(A), *post*, we will discuss the applicability of express preemption in the present case.

 In addition to preemption directly expressed by the words of a statute, preemption is implied where "the scheme of federal regulation is ' "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it . . . ." ' " (*Gade v. National Solid Wastes Management Assn.* (1992) 505 U.S. 88, 98 [112 S.Ct. 2374, 120 L.Ed.2d 73].) Further, preemption is implied "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*Ibid.*) Under this doctrine of "conflict" preemption, state common law actions are preempted where they would interfere with the full implementation of the federal program. (*Ibid.*)

Although federal regulations certainly address the requirements for and operation of MA plans in a comprehensive manner (see *Frastaci v. Vapor Corp.* (2007) 158 Cal.App.4th 1389, 1396 [70 Cal.Rptr.3d 402] [applying "field preemption" under the federal Locomotive Boiler Inspection Act]), we find it unnecessary to determine whether those regulations preempt the entire field of MA plan operation. We will, however, discuss and apply so-called "conflict" implied preemption in part IV.(B), *post*.

IV. Application

(A) Express Preemption

 Negligence requires, among its other elements, a duty and a breach of that duty. (*John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1188 [45 Cal.Rptr.3d 316, 137 P.3d 153].) Appellant's three additional causes of action also allege a duty and breach of that duty. As to all four causes of action, appellant has alleged respondent's duty arose from provisions of the Health and Safety Code, as set forth above.

 Courts frequently have held that statutory requirements can establish both duty and the applicable standard of care. (See 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 871, p. 100; *id.*, § 875, pp. 105–106; see also Evid. Code, § 669.) Nevertheless, in the present case, the federal statute expressly preempts application of state laws where "standards" for MA plans are established pursuant to the Medicare law.

Appellant asserts respondent is bound by state law standards for HMO organizations, including structural and contractual standards, established by the Health and Safety Code for HMO plans (see Health & Saf. Code, § 1345,

subd. (f)). In the case of HMO organizations under the federal MA program, however, regulations under the MA program address these same duties. Thus, the subject of Health and Safety Code section 1370, requiring establishment of quality-of-care review systems, is comprehensively addressed in subpart D—Quality Improvement, 42 Code of Federal Regulations section 422.152 et seq. (2008). Similarly, federal regulations comprehensively establish standards in the other areas appellant relies upon: provision of sufficient and timely services (appellant cites Health & Saf. Code, §§ 1367.01, 1367.03; see 42 C.F.R. §§ 422.101(a), 422.112(a), 422.504(a) (2008)) and duty of the plan to ensure that providers provide adequate and timely care (appellant cites Health & Saf. Code, §§ 1367, subds. (a)–(i), 1367.02; see 42 C.F.R. § 422.504 (2008)).

Accordingly, by the express terms of the federal preemption statute, the standards established under the Health and Safety Code are superseded. As a result, those Health and Safety Code sections cannot supply the standard of care for duties imposed upon respondent. To the extent appellant's causes of action are based on respondent's alleged breach of duties imposed by the cited Health and Safety Code provisions, the causes of action are preempted by the federal statute.

### (B) Implied Preemption

While the express language of the federal preemption statute, 42 United States Code section 1395w-26(b)(3), only precludes application of "positive state enactments" (i.e., statutes and administrative regulations), the doctrine of "conflict" preemption also requires preemption of state common law causes of action where the common law actions would " 'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*Gade v. National Solid Wastes Management Assn.,* *supra,* 505 U.S. at p. 98.)

We find that to be the case here and, therefore, we reject appellant's claim that an independent common law duty provides a basis for viable state law claims against respondent. In particular, the federal regulations provide that CMS will not approve contracts that do not assure reasonable and timely access to medical services or that fail to provide a quality assurance program to prevent exactly the kinds of inappropriate medical decisions appellant alleges here. (See 42 C.F.R. § 422.504 (2008).) If state common law judgments were permitted to impose damages on the basis of these federally approved contracts and quality assurance programs, the federal authorities would lose control of the regulatory authority that is at the very core of

Medicare generally and the MA program specifically. (See *Frastaci v. Vapor Corp., supra*, 158 Cal.App.4th at p. 1402.) Accordingly, we conclude that, to the extent appellant seeks to allege causes of action based on state common law concepts of duty independent of the Health and Safety Code provisions she has cited, those common law causes of action are preempted.

Appellant also contends CMS has stated that the preemption provision of the MA statute does not apply to common law tort actions. (See Medicare Program; Establishment of the Medicare Advantage Program, 69 Fed.Reg. 46866, 46913–46914 (Aug. 3, 2004).) That may well be correct concerning generally applicable common law actions, such as medical malpractice claims. However, in the present case, appellant does not base her claims against respondent on such common law duties. She asserts duties applicable specifically to health plans. As discussed above, it is the version of those duties set forth in the Health and Safety Code that is preempted by the establishment of duties pursuant to the MA statute. While *all* common law claims against MA organizations are not preempted merely because of the organization's MA status, *these* causes of action for breach of state statutory duties are preempted.

### (C) The Licensing Exception

Appellant contends her tort claims are exempted from the federal preemption statute because the claims "can be tied to state licensing standards establishing or evidencing the standard of care against which Pacificare's conduct can be measured." We need not determine in the present case the scope of this exception for "State licensing laws or State laws relating to plan solvency" (42 U.S.C. § 1395w-26(b)(3)) for the simple reason that this is not a proceeding to revoke respondent's license or to review a denial of that license.

Even if the state could revoke a health plan's license for conduct that violated state standards but not federal standards, a point we do not decide, a private litigant in an action for damages is not permitted to rely on those state standards to establish the standard of care for the same reasons set forth in the previous sections: the resulting inconsistencies in the conduct required of MA organizations would inhibit (if not altogether preclude) effective accomplishment " 'of the full purposes and objectives of Congress.' " (*Gade v. National Solid Wastes Management Assn., supra*, 505 U.S. at p. 98.) Accordingly, we conclude the licensing exception does not permit appellant to pursue her common law causes of action.

## Disposition

The judgment is affirmed. Respondent is awarded costs on appeal.

Kane, J., and Poochigian, J., concurred.

A petition for a rehearing was denied December 10, 2009, and appellant's petition for review by the Supreme Court was denied March 18, 2010, S179280. George, C. J., did not participate therein.