Filed 9/21/21  Quishenberry v. UnitedHealthcare CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| LARRY QUISHENBERRY,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>UNITEDHEALTHCARE, INC. et al.,<br><br>    Defendants and Respondents. | B303451<br><br>(Los Angeles County<br>Super. Ct. No. BC631077) |

APPEAL from judgments of the Superior Court of Los Angeles County, Ralph Hofer, Judge.  Affirmed.

Balisok & Associates and Russell S. Balisok for Plaintiff and Appellant.

Walraven & Westerfeld, Bryan S. Westerfeld and Jessica B. Hardy for Defendants and Respondents UnitedHealthcare, Inc., UnitedHealth Group Incorporated, UnitedHealthcare Services, Inc., and UHC of California.

Carroll, Kelly, Trotter & Franzen, Michael J. Trotter, Brenda M. Ligorsky, and David P. Pruett for Defendants and Respondents Health Care Partners Medical Group and Healthcare Partners LLC.

———————

Larry Quishenberry appeals from judgments of dismissal entered after the trial court sustained the demurrers of defendants UnitedHealthcare, Inc., UnitedHealth Group Incorporated, UnitedHealthcare Services, Inc., and UHC of California (collectively, the UnitedHealthcare entities) and Health Care Partners Medical Group and Healthcare Partners LLC (collectively, Healthcare Partners) without leave to amend. Quishenberry alleged his father, Eugene Quishenberry,[1] was prematurely discharged from a skilled nursing facility operated by GEM HealthCare, LLC (GEM), and Eugene died after his health deteriorated. Quishenberry sued GEM; Dr. Jae H. Lee, the doctor who provided Eugene's care at the GEM facility; the UnitedHealthcare entities, which provided a Medicare Advantage (MA) Health Maintenance Organization plan to Eugene; and Healthcare Partners, which provided physician services to Eugene, including the services of Dr. Lee. Quishenberry asserted causes of action for negligence, elder abuse, bad faith, and wrongful death.[2]

---

[1]    To avoid confusion, we refer to Eugene Quishenberry by his first name.

[2]    Quishenberry describes his first and second causes of action as claims for "[n]egligence and [r]ecklessness—elder abuse." We refer to these claims as negligence claims for simplicity.

On appeal, Quishenberry contends the trial court erred in ruling the Medicare Part C preemption clause (42 U.S.C. §1395w-26(b)(3)) barred his causes of action. Quishenberry also challenges the trial court's determination Health & Safety Code section 1371.25 barred his claims against the UnitedHealthcare entities because the claims were based on the UnitedHealthcare entities' vicarious liability for the acts of GEM and Dr. Lee. Because Quishenberry's claims are preempted, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Lawsuit*

Quishenberry filed this action on August 19, 2016 individually and as a successor in interest to Eugene. After the trial court sustained demurrers to the first amended complaint, Quishenberry filed a second amended complaint (complaint) alleging claims for negligence, elder abuse, bad faith,[3] and wrongful death. The complaint alleged Eugene, who was born on October 12, 1929, was enrolled in an MA plan offered by one or more of the UnitedHealthcare entities.[4] The relationships among the UnitedHealthcare entities were "complex and not fully known or understood by" Quishenberry. The complaint alleged the UnitedHealthcare entities delegated to HealthCare Partners their responsibility to provide certain health care benefits

---

[3]    Quishenberry does not on appeal challenge dismissal of this claim.

[4]    The second amended complaint incorrectly identified UnitedHealthcare, Inc. as United Health Care, Inc. and United Healthcare Insurance, Inc., and UHC of California as United Healthcare-California, Inc. and UHC-California, Inc.

(physician services) and administrative protections owed to MA plan enrollees by contracting with Healthcare Partners to provide physician services for the plan's enrollees. The UnitedHealthcare entities delegated to GEM,[5] which operated a skilled nursing facility in Pasadena, their responsibility to provide custodial care and administrative protections to plan enrollees.

In approximately November 2014, then-85-year-old Eugene broke his hip and was hospitalized at Huntington Hospital, which had a contract with the UnitedHealthcare entities to provide hospital services for enrollees. Eugene was later transferred to GEM's skilled nursing facility under the care of Dr. Lee, a medical doctor allegedly employed by Healthcare Partners. The complaint alleged that during Eugene's stay at GEM's skilled nursing facility, he developed severe pressure sores on his feet because of GEM's neglect. Neither Dr. Lee or GEM's nursing staff properly treated the sores, which made it difficult and painful for Eugene to walk without assistance.

Eugene was at GEM's skilled nursing facility for 24 days, from November 4 through 28, 2014. According to the complaint, Eugene was entitled under Medicare to an additional 76 days of care at GEM's skilled nursing facility with daily physical therapy and care for his pressure sores. "Nevertheless, following [Dr.] Lee's direction, and pursuant to the business practice of [Healthcare Partners] and the UnitedHealthcare entities, GEM furnished Eugene with a false statement that he was no longer qualified under Medicare for further inpatient care at GEM. [¶] Eugene was transferred to his home, where, without adequate nursing care and physical therapy and as a proximate cause of

---

[5]     In 2016 Quishenberry settled with GEM.

4

Dr. Lee's treatment decisions, Eugene's health declined, he experienced pain and suffering, and died."[6]

The complaint alleged as to the negligence cause of action, "Despite the said knowledge that GEM was not providing necessary skilled nursing care to its resident-patients . . . , the [UnitedHealthcare] entities, GEM and [Healthcare Partners] acquiesced to, encouraged, directed, aided and abetted [Dr.] Lee's action to discharge Eugene under circumstances where acceptable medical practice and Medicare rules required that Eugene remain at GEM for more intense attention to his health care needs." Further, the UnitedHealthcare entities, Healthcare Partners, and Dr. Lee acted recklessly and willfully because they "knew or should have known that they created the peril that enrollee patients including Eugene would be at risk of injury" and "consciously disregarded the peril and the probability of injury to resident-patients, including Eugene."

The complaint alleged a separate negligence cause of action against the UnitedHealthcare entities and Healthcare Partners based on the special relationship doctrine. The complaint asserted Dr. Lee was an agent of Healthcare Partners, and both Healthcare Partners and GEM were agents of the

---

[6] Although the complaint alleged Eugene died on August 24, 2014, Eugene's death certificate, which was attached to Quishenberry's successor-in-interest affidavit, shows Eugene died on August 24, 2015. Healthcare Partners argues that Eugene therefore lived for 269 days after his discharge from GEM's nursing facility, questioning whether Eugene's death could have been caused by his premature discharge. But whether Quishenberry would be able to prove at trial that Eugene's death was caused by his allegedly premature discharge from GEM is not before us in this appeal.

5

UnitedHealthcare entities.  The complaint alleged, "Both [Healthcare Partners] and the United Healthcare entities were by contract and by federal law in a position to control the conduct of [Dr.] Lee and GEM in their provision of care to Eugene . . . . [¶]  Both [Healthcare Partners] and the United Healthcare entities actually knew that GEM and Lee would formulate their treatment plan for Eugene so as to arrange for his early discharge from GEM to home, and actually knew that this treatment plan would be harmful to Eugene.  Instead of intervening to control GEM and Lee's treatment decision making, as by ensuring that GEM and Lee knew that further care and treatment at GEM was a covered benefit under Eugene's Medicare plan, each said defendant failed to take any action, and allowed Dr. Lee and GEM's discharge of Eugene to home."  The complaint added, "[Healthcare Partners] and the United Healthcare entities were motivated by their need to increase profit by reducing the cost of providing care to enrollees including Eugene in a skilled nursing facility setting."

For the elder abuse cause of action, the complaint alleged all defendants "had responsibility for the custodial care and custodial treatment of Eugene" because of their agreement with the Center for Medicare and Medicaid Services (CMS).[7]  The complaint alleged Healthcare Partners and the UnitedHealthcare entities "were and are legally responsible for the physical care

---

[7]     The Centers for Medicare & Medicaid Services is part of the United States Department of Health and Human Services and contracts with MA plan providers.  (<https://www.cms.gov/About-CMS/About-CMS> [as of Sept. 21, 2021], archived at <https://perma.cc/M49Y-2889>; *Uhm v. Humana, Inc.* (9th Cir. 2010) 620 F.3d 1134, 1138.)

6

and custody of enrollees including Eugene under Welfare & Institutions Code section 15610.57."

Finally, the complaint asserted a wrongful death cause of action against all defendants for Quishenberry's loss of consortium.

B. *Defendants' Demurrers*

On April 19, 2019 the UnitedHealthcare entities demurred to the second amended complaint. They argued Quishenberry's state law claims were preempted by the Medicare Act's preemption clause (42 U.S.C. § 1395w-26(b)(3); Medicare Part C preemption clause). Further, Quishenberry's claims were based on vicarious liability for the acts of GEM and Dr. Lee, and thus the claims were barred under section 1371.25 of the Knox-Keene Health Care Service Plan Act of 1975 (Health & Saf. Code, § 1340 et seq.; Knox-Keene Act). The UnitedHealthcare entities asserted Health & Safety Code section 1371.25 was not preempted by the Medicare Act, and if it was, Quishenberry's claims would also be preempted. In addition, Quishenberry failed to state viable claims for elder abuse and wrongful death.

Healthcare Partners and Dr. Lee also demurred, likewise asserting the Medicare Act preempted Quishenberry's claims. In addition, they asserted Quishenberry failed to exhaust his administrative remedies available under the Medicare Act before seeking judicial review. They also contended Quishenberry's claims for negligence and elder abuse were disguised challenges to the financial arrangements among the defendants, which were authorized under the Knox-Keene Act. Moreover, Dr. Lee could not be held liable for elder abuse because he was not in a custodial or caretaking relationship with Eugene.

C.	*The Trial Court's Ruling and Judgment*

After a hearing, on October 25, 2019 the trial court sustained the demurrers filed by the UnitedHealthcare entities and Healthcare Partners without leave to amend, but overruled Dr. Lee's demurrer.  Relying on *Roberts v. United Healthcare Services, Inc.* (2016) 2 Cal.App.5th 132 (*Roberts*), the court found Quishenberry's causes of action against the UnitedHealthcare entities and Healthcare Partners were preempted by the Medicare Act because the allegations involved defendants' "failure to administer properly the health care plan."  In addition, the claims against the UnitedHealthcare entities were "barred by Health & Safety Code section 1371.25 which provides that a healthcare service plan is not vicariously liable for acts or omissions of the actual health care services providers."

The trial court entered a judgment in favor of Healthcare Partners on December 3, 2019, and a judgment in favor of the UnitedHealthcare entities on December 6, 2019.  Quishenberry timely appealed both judgments.

**DISCUSSION**

A.	*Standard of Review*

"'In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory.' [Citation.]  "'"We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. . . .  We also consider matters which may be judicially noticed." . . . Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.'""  (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 768;

8

accord, *Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1010.) "A judgment of dismissal after a demurrer has been sustained without leave to amend will be affirmed if proper on any grounds stated in the demurrer, whether or not the court acted on that ground." (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324; accord, *Ko v. Maxim Healthcare Services, Inc.* (2020) 58 Cal.App.5th 1144, 1150.)

B.      *Preemption Principles*

"""The supremacy clause of the United States Constitution establishes a constitutional choice-of-law rule, makes federal law paramount, and vests Congress with the power to preempt state law." [Citations.]  Similarly, federal agencies, acting pursuant to authorization from Congress, can issue regulations that override state requirements.  [Citations.]  Preemption is foremost a question of congressional intent: did Congress, expressly or implicitly, seek to displace state law?'" (*Solus Industrial Innovations, LLC v. Superior Court* (2018) 4 Cal.5th 316, 331 (*Solus*); accord, *Quesada v. Herb Thyme Farms, Inc.* (2015) 62 Cal.4th 298, 307-308 (*Quesada*).)

"'Congress may expressly preempt state law through an explicit preemption clause, or courts may imply preemption under the field, conflict, or obstacle preemption doctrines.'" (*Solus, supra*, 4 Cal.5th at p. 332; accord, *Quesada, supra*, 62 Cal.4th at p. 308.)  "'[E]xpress preemption arises when Congress "define[s] explicitly the extent to which its enactments pre-empt state law."'" (*Parks v. MBNA America Bank, N.A.* (2012) 54 Cal.4th 376, 383; accord, *Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 936.)  "Implied preemption, for its part, may be found '(i) when it

9

is clear that Congress intended, by comprehensive legislation, to *occupy the entire field* of regulation, leaving no room for the states to supplement federal law [citation]; (ii) when compliance with both federal and state regulations is an *impossibility* [citation]; or (iii) when state law "stands as an *obstacle* to the accomplishment and execution of the full purposes and objectives of Congress.""" (*Solus*, at p. 332; accord, *Parks*, at p. 383.)

"We 'conduct[] the search for congressional intent through the lens of a presumption against preemption. [Citations.] The presumption is founded on "respect for the States as 'independent sovereigns in our federal system'"; that respect requires courts "to assume that 'Congress does not cavalierly pre-empt state-law causes of action.""" (*Solus, supra*, 4 Cal.5th at p. 332; accord, *Quesada, supra*, 62 Cal.4th at pp. 312-313.) "A rebuttal of the presumption requires a demonstration that preemption was the ""clear and manifest purpose of Congress."""" (*Quesada*, at p. 313; accord, *Roberts, supra*, 2 Cal.App.5th at p. 142.) The party asserting preemption has the burden of overcoming the presumption against preemption and demonstrating preemption applies. (*Quesada*, at p. 308; *Jankey v. Lee* (2012) 55 Cal.4th 1038, 1048.) "Where, as here, preemption turns on questions of law such as the meaning of a preemption clause or the ascertainment of congressional intent, our review is de novo." (*Roberts*, at p. 142; accord, *People v. Superior Court (Cal Cartage Transportation Express, LLC)* (2020) 57 Cal.App.5th 619, 627; see *Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10 ["federal preemption presents a pure question of law"].)

C.    *The Medicare Act and Part C Preemption*
The Medicare Act (42 U.S.C. § 1395 et seq.; Medicare Act) "established a federally subsidized health insurance program

that is administered by the Secretary of Health and Human Services (the Secretary) . . . . Part A of Medicare, 42 United States Code section 1395c et seq., covers the cost of hospitalization and related expenses that are 'reasonable and necessary' for the diagnosis or treatment of illness or injury . . . . Part B of Medicare (42 U.S.C. § 1395j et seq.) establishes a voluntary supplementary medical insurance program for Medicare-eligible individuals and certain other persons over age 65, covering specified medical services, devices, and equipment." (*McCall v. PaciCare of Cal., Inc.* (2001) 25 Cal.4th 412, 416; accord, *Roberts, supra*, 2 Cal.App.5th pp. 139-140.)

Under Part C of the Act, added in 1997 (42 U.S.C. §§ 1395w-21 to 1395w-28), "Medicare beneficiaries can sign up for a privately administered health care plan—originally called a "Medicare+Choice" plan, but later renamed a "Medicare Advantage" plan—that provides all of the Part A and B benefits as well as additional benefits. [Citations.] If a beneficiary elects to participate in such a plan, the government pays the plan's administrator a flat, monthly fee to provide all Medicare benefits for that beneficiary. Because Part C limits the government's responsibility to adjust the monthly fee, the private health plan—rather than the government—ends up 'assum[ing] the risk associated with insuring' the beneficiary." (*Roberts, supra*, 2 Cal.App.5th p. 140; accord, *Martin v. PacifiCare of California, supra*, 198 Cal.App.4th at p. 1394; *Yarick v. PacifiCare of California* (2009) 179 Cal.App.4th 1158, 1163 (*Yarick*).)

When it was first enacted in 1997, Part C contained a preemption clause that provided, "(A) In general.—The standards established under this subsection shall supersede any State law or regulation (including standards described in subparagraph

11

(B)) with respect to Medicare+Choice plans which are offered by Medicare+Choice organizations under this part to the extent such law or regulation is inconsistent with such standards.  [¶] (B) Standards specifically superseded.—State standards relating to the following are superseded under this paragraph: [¶] (i) Benefit requirements. [¶] (ii) Requirements relating to inclusion or treatment of providers. [¶] Coverage determinations (including related appeals and grievance processes)."  (Pub.L. No. 105-33, § 1856(b)(3) (Aug. 5, 1997) 111 Stat. 251.)

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (2003 Medicare Modernization Act) amended the Medicare Part C preemption clause to contain the current language:  "Relation to state laws.—The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part."  (Pub.L. No. 108-173, § 232 (Dec. 8, 2003) 117 Stat. 2066; 42 U.S.C. § 1395w-26(b)(3).)

D.      *Quishenberry's Claims Are Expressly Preempted by the Medicare Part C Preemption Clause*

Quishenberry's negligence, elder abuse, and wrongful death causes of action are based on California law in an area in which Medicare Part C regulations have established standards for MA plans.  Under part 422 of title 42 of the Code of Federal Regulations, the Secretary through CMS has "establishe[d] standards and set[] forth the requirements, limitations, and procedures for Medicare services furnished, or paid for, by Medicare Advantage organizations through Medicare Advantage plans."  (42 C.F.R. § 422.1(b).)  The regulations include CMS's approval of the network of MA providers "to ensure that all

12

applicable requirements are met, including access and availability, service area, and quality." (42 C.F.R. § 422.4(a)(1)(i)).) CMS also sets standards governing provider "selection and credentialing" for MA plans (42 C.F.R. § 422.204); requirements relating to "an ongoing quality improvement program" for each MA plan (42 C.F.R. § 422.152(a)); and the requirement that "[f]or each plan, the organization must correct all problems that come to its attention through internal surveillance, complaints, or other mechanisms" (42 C.F.R. § 422.152(f)(3)). In addition, the MA organization must consult with physicians who provide services under the MA plan regarding the MA organization's "medical policy, quality improvement programs and medical management procedures" and ensure the physicians' "[d]ecisions with respect to utilization management, enrollee education, coverage of services, and other areas in which the guidelines apply are consistent with the guidelines." (42 C.F.R. § 422.202(b)(3)).

CMS has also promulgated regulations requiring MA organizations to provide services "covered by Part A and Part B (if the enrollee is entitled to benefits under both parts)" and to comply with "CMS's national coverage determinations," "[g]eneral coverage guidelines," and "[w]ritten coverage decisions of local Medicare contractors with jurisdiction for claims in the area in which services are covered under the MA plan." (42 C.F.R. § 422.101 (b)(1-3).) Under Part A, Medicare benefits include coverage of "post-hospital extended care services for up to 100 days during any spell of illness." (42 U.S.C. § 1395d(a)(2)(A).) The regulations require an MA organization to provide coverage of posthospital extended care services at a skilled nursing facility if an enrollee "[has] been an inpatient in a qualifying hospital for at least three (3) consecutive calendar

days, not including the day of the discharge, and must have been discharged in or after the month he or she became eligible for Medicare." (*Rapport v. Leavitt* (W.D.N.Y. 2008) 564 F.Supp.2d 186, 188-189, citing 42 C.F.R. § 409.30(a).)

To receive coverage, "the beneficiary must (1) require skilled nursing or rehabilitative services, (2) on a daily basis, (3) the services must be furnished for a condition for which the beneficiary received inpatient services, for a condition which arose while the beneficiary was receiving care in an SNF [skilled nursing facility] for a condition for which the beneficiary was hospitalized, or, for MA beneficiaries whose plans waive the 3 day hospital stay requirement, for a condition for which a physician has determined that direct admission to an SNF was medically appropriate without a prior hospital stay, and (4) the services must be such that as a practical matter they can only be provided at an SNF on an inpatient basis." (*United HealthCare Ins. Co. v. Sebelius* (D. Minn. 2011) 774 F.Supp.2d 1014, 1019, citing 42 C.F.R. § 409.31.)

Quishenberry's common law negligence and statutory elder abuse and wrongful death claims against the UnitedHealthcare entities[8] and Healthcare Partners are based on the premature

---

[8] Quishenberry argues that because the complaint alleged it is "uncertain[]" which of the UnitedHealthcare entities contracted with CMS to provide an MA plan to Eugene, none of the entities qualifies as an MA organization. But Quishenberry's claims are premised on the provision of an MA plan to Eugene, and therefore, only the UnitedHealthcare entity that provided the MA plan would be directly liable. Any liability of the related UnitedHealthcare entities would be derivative of the liability of the MA plan provider, and thus preempted to the same extent the claims against the MA organization are preempted. (See *Uhm v.*

14

discharge of Eugene from GEM without adequately treating his pressure sores or providing sufficient physical therapy. The complaint alleged Eugene stayed for 24 days at GEM's skilled nursing facility, but under Medicare Eugene was entitled to an additional 76 days of stay to receive daily physical therapy and care for his pressure sores. Further, "[d]espite the said knowledge that GEM was not providing necessary skilled nursing care to its resident-patients," Healthcare Partners and the UnitedHealthcare entities "acquiesced to, encouraged, directed, aided and abetted [Dr.] Lee's action to discharge Eugene under circumstances where acceptable medical practice and Medicare rules required that Eugene remain at GEM for more intense attention to his health care needs." These allegations require a determination of the amount of allowable Medicare benefits for skilled nursing care, an area regulated by standards established by CMS; thus, Quishenberry's claims are preempted. (See 42 C.F.R. § 422.101 [MA plan must provide services covered by Parts A and B]; 42 C.F.R. §§ 409.30 & 409.31 [setting eligibility requirements for skilled nursing facility benefits].)[9]

_____

*Humana, Inc., supra*, 620 F.3d at pp. 1157-1158 [claims against parent company of MA plan provider were preempted because the liability of the parent was "entirely derivative of its relationship with the [MA plan provider]"].)

[9]     The complaint also alleged GEM nursing staff and Dr. Lee did not properly treat Eugene's pressure sores. The UnitedHealthcare entities argue these allegations concern the UnitedHealthcare entities' oversight of GEM and Dr. Lee, which is subject to CMS's requirement that MA organizations "operate a quality assurance and performance improvement program" (42 C.F.R. § 422.504(a)(5)), maintain an "ongoing quality improvement program," and "correct all problems that come to its

15

Quishenberry contends his claims against Healthcare Partners are not preempted because only an MA organization is entitled to the benefit of the Medicare Part C preemption clause, and it is undisputed Healthcare Partners is not an MA organization. But the allegations concerning Eugene's eligibility for posthospital extended care services at a skilled nursing facility are governed by the CMS standards regardless of whether the claims are asserted against an MA organization. For example, 42 Code of Federal Regulations 409.30 sets standards for the provision of posthospital skilled nursing facility care, without any reference to MA organizations.[10] Although the Medicare Part C preemption provision applies to preempt state laws "with respect to MA plans which are offered by MA organizations under this part" (42 U.S.C. § 1395w-26(b)(3)), Healthcare Partners's liability arises from the decision to

---

attention through internal surveillance, complaints, or other mechanisms" (42 C.F.R. § 422.152(f)(3)). The UnitedHealthcare entities are correct that to the extent the complaint alleged they failed to provide sufficient oversight of the care provided by GEM and Dr. Lee, Quishenberry's claims would be preempted. As to Healthcare Partners, the complaint alleged Dr. "Lee was employed by [Healthcare Partners] . . . to provide physician services to enrollees including Eugene," but Quishenberry did not argue in the trial court in opposition to Healthcare Partners' demurrer, nor does he argue on appeal, that his claims against Healthcare Partners are based on its vicarious liability as Dr. Lee's employer.

10    Under 42 Code of Federal Regulations section 409.30, posthospital skilled nursing facility care "is covered only if the beneficiary meets the requirements of this section and only for days when he or she needs and receives care of the level described in § 409.31."

16

discharge Eugene based on a determination Eugene was not eligible for additional Medicare benefits under the MA plan offered by UnitedHealthcare entities (an MA organization).[11]

Our conclusion that preemption applies to Quishenberry's causes of action against the UnitedHealthcare entities and against Healthcare Partners is consistent with the holdings by the courts that have broadly construed the Medicare Part C preemption clause. (See *Roberts*, *supra*, 2 Cal.App.5th at pp. 138, 143 [MA standards governing the content of an MA plan's marketing materials and adequacy of its network expressly

---

[11] Even if express preemption did not apply, Quishenberry's claims would be barred by implied preemption based on the doctrine of "obstacle preemption" because his state law claims would "stand[] as an obstacle to the full accomplishment and execution of congressional objectives." (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 778; accord, *Solus, supra*, 4 Cal.5th at p. 332.) Allowing Quishenberry to bring state law claims against Healthcare Partners based on the premature discharge of Eugene from GEM's skilled nursing facility would undermine CMS's ability to regulate Medicare benefits coverage, including eligibility requirements for skilled nursing facility care. (See *Roberts, supra*, 2 Cal.5th at p. 149 ["[C]laims based on misrepresentations in United Healthcare's marketing materials and based on the adequacy of its plan are impliedly preempted by the Act."]; *Yarick, supra*, 179 Cal.App.4th at pp. 1167-1168 ["If state common law judgments were permitted to impose damages on the basis of these federally approved contracts and quality assurance programs, the federal authorities would lose control of the regulatory authority that is at the very core of Medicare generally and the MA program specifically."].)

preempted state law claims for unfair competition, misleading advertising, constructive fraud, and financial elder abuse under Medicare Part C preemption clause]; *Uhm v. Humana, Inc., supra*, 620 F.3d 1134, 1148-1153 (*Uhm*) [under Medicare Part C preemption clause, expressly incorporated into Medicare Part D, CMS regulations governing Part D prescription drug plan's marketing materials preempted state law fraud and consumer protection act claims]; *Morrison v. Health Plan of Nev., Inc.* (Nev. 2014) 130 Nev. 517, 523 [328 P.3d 1165, 1169] [CMS regulations governing provider selection and quality improvement program preempted state common law negligence claim alleging MA organization negligently directed plaintiff to clinic and failed to investigate clinic's unsafe medical practices].)

As our colleagues in Division Two of this district explained in *Roberts, supra*, 2 Cal.App.5th at page 143, "[T]he plain language of section 1395w-26(b)(3) plainly spells out Congress's intent that the standards governing Medicare Advantage plans will displace '*any* State law or regulation' except for State laws regarding licensing or plan solvency."  Further, the legislative history of the 2003 Medicare Modernization Act—in replacing the prior preemption clause that only superseded "state standards" in four discrete areas and other "[s]tate laws or regulations" inconsistent with the Part C standards with the current language preempting "any [s]tate law or regulation"—shows Congress's clear intent to broaden the scope of the preemption clause. (*Roberts*, at p. 143.)

As the Conference Report accompanying the 2003 House bill explained, "Medicare law currently preempts state law or regulation from applying to M+C plans to the extent they are inconsistent with federal requirements imposed on M+C plans, and specifically, relating to benefit requirements, the inclusion or

18

treatment of providers, and coverage determinations (including related appeals and grievance processes). . . . [¶] . . . Federal standards established by this legislation would supersede any state law or regulation (other than state licensure laws and state laws relating to plan solvency) with respect to MA plans offered by MA organizations." (H.R. Rep. No. 108-391, 1st Sess., pp. 1, 556 (2003).) The report added, "The conference agreement clarifies that the MA program is a federal program operated under Federal rules. State laws do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency. There has been some confusion in recent court cases." (*Id*. at p. 557; see *Roberts, supra*, 2 Cal.App.5th at p. 143.)

Moreover, in its proposed rule for the MA program, CMS stated, "Congressional intent is now unambiguous in prohibiting States from exercising authority over MA plans in any area other than State licensing laws and State laws relating to plan solvency." (69 Fed.Reg. 46866, 46880 (Aug. 3, 2004).) CMS added, "In 2003, section 232(a) of the [2003 Medicare Modernization Act] . . . broadened Federal preemption of State standards to broadly apply preemption to all State law or regulation (other than State licensing laws or State laws relating to plan solvency)." (69 Fed.Reg. at p. 46926.) The 2003 Medicare Modernization Act "revision relieves uncertainty of which State laws are preempted by 'preempting the field' of State laws other than State laws on licensing and solvency." (*Id*. at p. 46927.)

In its final rule, CMS noted that prior to enactment of the 2003 Medicare Modernization Act, "[t]he presumption was that a State law was not preempted if it did not conflict with an M+C requirement, and did not fall into one of the four specified categories where preemption was presumed . . . . [¶] We concluded that the [2003 Medicare Modernization Act] reversed

19

this presumption and provided that State laws are presumed to be preempted unless they relate to licensure or solvency. We also referenced the Congress' intent that the MA program, as a Federal program, operate under Federal rules, and referred to the Conference Report as making clear the Congress' intent to broaden the scope of preemption." (70 Fed.Reg. 4194, 4319 (Jan. 28, 2005).)

Quishenberry also contends the Medicare Part C preemption clause does not preempt his state common law claims because the clause's "language usually is interpreted to preempt only 'positive state enactments,' that is, laws and administrative regulations, but not the common law." (*Yarick, supra*, 179 Cal.App.4th 1158, 1165-1166, citing *Sprietsma v. Mercury Marine* (2002) 537 U.S. 51, 63 (*Sprietsma*); accord, *Cotton v. StarCare Medical Group* (2010) 183 Cal.App.4th 437, 450-451 (*Cotton*) ["The statute's use of the term 'standards' and the phrases 'law or regulation' and 'with respect to MA plans' reflects Congress intended 'to preempt only "positive state enactments," that is, laws and administrative regulations, but not the common law.'"].) Quishenberry's contention is not persuasive.

In *Yarick*, the Fifth Appellate District rejected the defendant MA organization's argument the Medicare Part C preemption clause expressly preempted the plaintiff's claims for negligence, elder abuse, and wrongful death arising from the allegedly premature discharge of decedent from a health care facility to the extent the claims were based on common law duties independent of standards under the Knox-Keene Act, but the court found the common law claims were impliedly preempted under the Medicare Act. (*Yarick, supra*, 179 Cal.App.4th at p. 1161, 1166-1168.) In *Cotton*, 183 Cal.App.4th at pages 450 to 451, the Fourth Appellate District read the Medicare Part C

preemption provision even more narrowly than *Yarick*, concluding the plaintiff's claims for negligence, elder abuse, and wrongful death were not preempted because the Medicare Part C preemption clause only superseded state laws or regulation "with respect to" MA plans, that is, state laws or regulations that targeted MA plans.  (*Id*. at pp. 452-453.)

We agree with our colleagues in *Roberts*, *supra*, 2 Cal.App.5th at pages 145 to 147 and decline to follow *Cotton* and *Yarick*.  As the court in *Roberts* explained, *Cotton* and *Yarick* are inconsistent with *Riegel v. Medtronic, Inc.* (2008) 552 U.S. 312, 315, 324, in which the Supreme Court held the preemption clause in the Medical Device Amendments of 1976 (21 U.S.C. § 360k), which preempted "state 'requirements,' reached 'common-law duties' as well as duties created by positive law." (*Roberts, supra*, at 2 Cal.App.5th at p. 145, quoting *Riegel*, at p. 324.)  The court in *Roberts* explained *Riegel* rejected "*Cotton's* holding that Part C's preemption clause only reaches laws specifically targeting Medicare Advantage plans" by concluding the Medical Device Amendments of 1976's preemption clause that reached "'requirements . . . with respect to'" medical devices did not mean "that the state laws preempted by that clause 'must apply *only* to the relevant device, or only to medical devices and not to all products and all actions in general.'"  (*Roberts*, at pp. 146-147, quoting *Riegel, supra*, 552 U.S. at pp. 327-328.)

We also agree with *Roberts* that *Sprietsma, supra*, 537 U.S. at page 51, relied on by *Cotton* and *Yarick*, is not controlling as to the determination of the scope of Medicare Part C preemption. (*Roberts, supra*, 2 Cal.App.5th at pp. 145-146.)  In *Sprietsma*, the Supreme Court held the language of the express preemption clause in the Federal Boat Safety Act of 1971, which provided that "a State . . . may not establish, continue in effect, or enforce

21

a law or regulation establishing a recreational vehicle or associated equipment performance or other safety standard," did not preempt common law claims. (*Sprietsma*, at pp. 58, 63-64.) The court in *Roberts* explained, "*Sprietsma* held that the clause reached only positive state enactments and grounded its holding on three points: (1) '[T]he article "a" before "law or regulation" implies a discreteness—which is embodied in statutes and regulations—that is not present in the common law' (*Sprietsma*, at p. 63); (2) the word 'law' in 'law or regulation' 'might . . . be interpreted to include regulations, which would render the express reference to "regulation" . . . superfluous' (*ibid.*); and (3) the existence of the savings clause, which exists to '"save"' '"some significant number of common-law liability cases"' (*ibid.*, quoting *Geier v. American Honda Motor Co.* (2000) 529 U.S. 861, 868)." (*Roberts*, at pp. 145-146.)

 *Roberts* distinguished *Sprietsma* as to all three bases for its holding: "[*Sprietsma's*] first and third rationales are wholly inapplicable to Part C. Part C's preemption clause refers to 'any State law or regulation'—not 'a State law or regulation'; because '"the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'"' [citations], '[t]he use of "any" negates the "discreteness" that the Court identified in *Sprietsma*' . . . . Part C also has no clause saving common law actions. The closest the Act comes is section 1395, which reserves to state law only the 'supervision or control' (1) 'over the practice of medicine or the manner in which medical services are provided,' (2) 'over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services,' or (3) 'over the administration or operation of any such institution.' (42 U.S.C. § 1395.) Even if we assume that Part C's later-enacted express preemption clause did not supersede this reservation

clause . . . , the reservation clause does not purport to preserve common law actions dealing with the same subjects otherwise covered by Part C's standards—and hence does not override Part C's preemption clause." (*Roberts, supra*, 2 Cal.App.5th at p. 146.)

As to the second concern—"that the word 'regulation' 'might' be superfluous if the word 'law' were read broadly to reach *all* positive and common law enactments"—the court in *Roberts* concluded this was "too thin a reed upon which to leave all common law actions intact when doing so, as noted above, would disrupt the efficacy of the Center's preapproval of marketing materials and plan coverage." (*Roberts, supra*, 2 Cal.App.5th at p. 146.) We agree with *Roberts's* reasoning that the "canon of statutory construction that counsels against construing words as surplusage," albeit "a guide for ascertaining legislative intent," "is not a command," and "[w]here . . . that canon leads to a result at odds with the otherwise clearly expressed legislative intent, the canon necessarily yields to that intent." (*Roberts*, at p. 146; accord, *Uhm, supra*, 620 F.3d at p. 1154 ["[G]iven the tentative nature of *Sprietsma's* superfluity point—using the word 'might'— as well as the key differences we have identified between the [Federal Boat Safety Act] and the [2003 Medicare Modernization] Act, we hold that *Sprietsma* does not control here."].) Although we generally construe words in a statue to avoid surplusage, this canon of construction must yield to the plain language of the Medicare Part C preemption clause and its legislative history that clearly state Congress's intent that Medicare Part C's

standards preempt "any" state law or regulation (except for state licensing or plan-solvency laws) with respect to MA plans.[12]

## DISPOSITION

The judgments are affirmed.


FEUER, J.


We concur:


PERLUSS, P. J.


SEGAL, J.

---

[12] Because the Medicare Part C preemption clause preempts Quishenberry's state common law and statutory claims, the trial court did not err in sustaining the demurrers filed by the United HealthCare entities and Healthcare Partners without leave to amend. Further, we do no reach whether Quishenberry failed to exhaust his administrative remedies under the Medicare Act; whether Quishenberry's claims were barred under Health & Safety Code section 1371.25 of the Knox-Keene Act; and whether Quishenberry stated viable claims for elder abuse and wrongful death.